IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DAVID GOODRICH and            )
COURTNEY GOODRICH,            )
Individually and as Next Friends of  )
ASHER LUKE GOODRICH, a minor,  )
                               )
        Plaintiffs,            )    CIVIL ACTION FILE NO.
                               )
v.                             )    1:16-CV-03116-TWT
                               )
FISHER-PRICE, INC.,            )
                               )
        Defendant.             )
_____)

**DEFENDANT FISHER-PRICE, INC.'S MEMORANDUM OF LAW IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

This is a case arising out of a brief, resolved breathing interruption that

Asher Goodrich, a seven week old infant, experienced while lying in a Fisher-Price

Rock N' Play Sleeper (the "RNP" or "Rock 'N Play") on July 25, 2014. Although

the Rock 'N Play complies with all applicable product safety regulations, Plaintiffs

brought a litany of products liability claims against Fisher-Price claiming --

without scientific support -- that the Rock 'N Play is defective because it inclines

its flat sleeping surface to 30 degrees from the horizontal.

All of Plaintiffs' claims fail because Plaintiffs lack any probative, admissible evidence of causation. Simultaneously with this filing, Fisher-Price has also moved to exclude the testimony of Plaintiffs' experts. The testimony of those experts is the sole and exclusive evidence Plaintiffs have proffered to demonstrate that Asher's breathing interruption was caused by the Rock 'N Play. If the Court excludes that evidence, which Fisher-Price submits it must do, there is a total failure of causation in this case and judgment must be entered.[1]

Some of Plaintiffs' claims also fail for other fundamentally simple reasons. For example, Plaintiffs' gross negligence claim fails because there is no evidence in the record that Fisher-Price "acted without even slight care" -- the relevant standard under Georgia law. And Plaintiffs' failure to warn claim fails because Plaintiffs admittedly never read the conspicuous warnings affixed to the Rock 'N Play. Additionally, there can be no manufacturing defect claim here (which applies to Counts I-III), because there is no evidence that the subject Rock 'N Play deviated from its manufacturing or design specifications or from otherwise identical units manufactured to the same specifications. These failings alone independently warrant summary judgment, regardless of the Court's rulings on Fisher-Price's *Daubert* motions.

---

[1] Additionally, without this expert testimony, Plaintiff cannot prove the Rock 'N Play was defective, or that Fisher-Price was negligent (let alone grossly negligent).

With the tort claims out of the case, Plaintiffs' claim for punitive damages also fails as it cannot stand alone without a corresponding tort. And in any event, punitive damages are not available in this case under Georgia law because the Rock 'N Play complies with all applicable product safety regulations.

In short, on the undisputed factual record, Plaintiffs' claims all fail. Judgment should be entered in favor of Fisher-Price.

## II.    STATEMENT OF FACTS

### A. The Rock 'N Play

The Rock 'N Play is an infant inclined sleep product. In all Rock 'N Plays, as shown in the image of the Goodrich Rock 'N Play below, an infant rests flat on his or her back at an incline of no more than 30 degrees. (Statement of Material Facts to Which There Is No Genuine Issue to Be Tried ("SOMF") ¶ 1.)



At the time of its design, development, and first sale, the Rock 'N Play complied in all respects with ASTM International standard F2194-07, which was the cradle and bassinet standard applicable to the RNP at the time. (*Id.* at ¶ 2.)

3

Indeed, the Rock 'N Play was designed, manufactured, and labeled in compliance with this standard, as confirmed by test results from third party testing institutions Bureau Veritas and SGS. (*Id.* at ¶ 4.) This standard was developed by ASTM International's Committee F15 on Consumer Products -- specifically Subcommittee F15.18 on Cribs, Toddler Beds, Play Yards, Bassinets, Cradles and Changing Tables, whose membership includes employees of the U.S. Consumer Product Safety Commission ("CPSC"), the American Academy of Pediatrics ("AAP"), and other consumer safety groups, as well as manufacturers. (*Id.* at ¶ 3.) The Rock 'N Play (including the Goodrich RNP) also complied with the revised standard (F2194-10) that ASTM issued in April 2010. (*Id.* at ¶ 5.)

In September 2012, ASTM further revised the standard (F2194-12a) to specifically exclude from its scope infant products with an inclined sleep of greater than 10 degrees. This revised standard excluded the Rock 'N Play from its scope because it is an infant product with an inclined sleep surface of 30 degrees. (*Id.* at ¶ 1.) In May 2015, ASTM, in conjunction with CPSC, issued a new standard (F3118-15) governing infant inclined sleep products, which are defined in section 3.1.6 as "a freestanding product, *intended to provide a sleeping accommodations for an infant up to approximately 5 months of age, that is supported by a stationary or rocker base with one or more inclined sleep surface positions for the seat back*

4

that are *greater than 10 degrees and do not exceed 30 degrees from the horizontal*." (*Id.* at ¶ 6 (emphasis added).)

In April 2017, the CPSC issued a notice of proposed rulemaking proposing to adopt the safety standards found in ASTM F3118-17 (the most current revision) as a mandatory safety rule under the Consumer Product Safety Act (CPSA), which is expected to be issued in final form in due course later this year. (*Id.* at ¶ 7.) It is uncontroverted that the Rock 'N Play and its inclined sleep angle complies with all past applicable ASTM standards governing infant inclined sleep products, all current applicable ASTM standards governing infant inclined sleep products, and complies with the proposed safety standard in the Federal Register. (*Id.* at ¶¶ 4, 8.)

## B. The AAP Policy Statement

In November 2011, the AAP issued a policy statement with a series of recommendations for infant sleeping environments. (*Id.* at ¶ 30.) One such recommendation was that "Elevating the head of the infant's crib while the infant is supine is not recommended," citing to Tobin. The guidelines continued: "It is ineffective in reducing gastroesophageal reflux; in addition, it might result in the infant sliding to the foot of the crib into a position that might compromise respiration." (*Id.* at ¶ 31.) Neither the AAP Statement, nor the Tobin article (the testing in Tobin elevated infants to thirty degrees) articulate any risk of airway

obstruction, positional asphyxia, or other airway compromise resulting from inclined sleep. The only risk articulated by the AAP is the risk resulting from an infant sliding to the foot of the crib. The RNP is not a crib and is covered by completely different ASTM and CPSC standards and regulations than cribs.[2]

Another recommendation articulated in the AAP statement is that "Sitting devices, such as car safety seats, strollers, swings, infant carriers, and infant slings, are not recommended for routine sleep. Infants who are younger than 4 months are particularly at risk, because they might assume positions that can create risk of suffocation or airway obstruction." (*Id.* at ¶ 32.) The Rock 'N Play is an infant inclined sleep product as defined in ASTM F3118-15 (currently F3118-17), and CPSC's proposed rule in the Federal Register. The Rock 'N Play is not a sitting device. Neither the ASTM standard for inclined sleep products, nor the proposed mandatory rule of the CPSC for inclined sleep products, set any limit on how long a child can sleep in an inclined sleep product, nor do they recommend that an infant be removed from the sleep product once the infant falls asleep.

## C. SIDS and Apparent Life Threatening Events ("ALTE")/Brief Resolved Unexplained Event ("BRUE")

About 3,500 infants die from Sudden Unexplained Death ("SUD") or

---

[2] There is no allegation here that Asher slid to the foot of the RNP, which in any event is not physically possible given the size and shape of the RNP.

Sudden Infant Death Syndrome ("SIDS") each year in the United States. (*Id.* at ¶ 34.) It is the leading cause of death among infants one month to one year of age. (*Id.*) It remains unpredictable despite years of research. (*Id.*) In addition to SUD/SIDS events, there are thousands of events each year in which infants cease breathing for varying periods of time but do not die. (*Id.* at ¶ 35.) These events bear descriptors such as: "Apparent Life Threatening Event" (ALTE); "Brief Resolved Unexplained Event" (BRUE); "Prolonged Apnea"; and "Near Miss." (*Id.*)

**D. The Incident**

Plaintiffs David Goodrich and Courtney Goodrich were given a used Rock 'N Play by their neighbor a few weeks prior to the July 25, 2014 event that is the subject of this litigation. (*Id.* at ¶ 9.) Plaintiffs did not receive the Consumer Information (use instructions) that accompanied the Rock 'N Play from their neighbor and, prior to the event, neglected to read the warnings conspicuously affixed to the Rock 'N Play itself. (*Id.* at ¶ 10.)

On July 25, 2014, Plaintiff Courtney Goodrich, a school teacher, visited her first grade classroom to prepare for the upcoming school year with her son, Minor Plaintiff Asher Goodrich, a seven week old newborn, and her son's grandmother, Ms. Jan Hinson, co-counsel for Plaintiffs. (*Id.* at ¶ 11.) Following lunch away from school, Mrs. Goodrich, Ms. Hinson and Asher returned to the classroom. (*Id.* at

¶ 12.) Asher fell asleep in his car seat during the drive, and upon their arrival at the classroom, Asher was transferred while still asleep to the Rock 'N Play by Mrs. Goodrich and Ms. Hinson at around 2:15 P.M. (*Id.*)

At the time of the transfer, Mrs. Goodrich and Ms. Hinson started to use the restraint system consisting of a crotch strap and snap waist belts, but thinking the restraint system was "dumb," did not strap Asher into the RNP. (*Id.* at ¶ 13.) Mrs. Goodrich and Ms. Hinson also placed a receiving blanket in the crib and tucked it around Asher. (Ex. F, Goodrich Dep. Tr. at 30:15-17.) The failure to use the restraint system and the use of the blanket are both contrary to explicit and clear warnings affixed to the RNP and in the Consumer Information provided with the product when sold. (SOMF at ¶ 10, Ex. G, FPI_000017; Ex. H, FPI_000029-40.)

At around 3:15 P.M., while Mrs. Goodrich was out of the room, Ms. Hinson observed an ALTE/BRUE in Asher. (SOMF at ¶ 15.) Ms. Hinson testified that Asher was limp, and blue around the eyes and lips. (*Id.* at ¶ 16.) Ms. Hinson then picked Asher up, and Asher started to breathe again. (*Id.*)

**E. Medical Treatment Following the Incident**

After consulting with Asher's pediatrician, Mrs. Goodrich took Asher to Children's Healthcare of Atlanta ("CHOA") at Hughes Spalding. (*Id.* at ¶ 17.) Once there, Asher was admitted to the ER. (*Id.*) Test results for all of his systems

were completely normal with the exception of an elevation of white cells in the blood, which later completely resolved. (*Id.*)

Asher was transferred to CHOA's Egleston Hospital around 11:00 P.M., where he was again examined. (*Id.* at ¶ 18.) Among other things, Asher's oxygen saturation was 100%, indicating no cyanosis (no blueness), and he appeared well and alert. (*Id.*) It was noted that Asher had what was to be diagnosed as a common infant heart murmur, which later completely resolved. (Ex. J at GOODRICH_A_000080.) Mrs. Goodrich reported that Asher occasionally spit up while feeding but that it was minimal and had not inhibited his growth. (*Id.* at GOODRICH_A_000070.) While in the hospital, because of his reflux history, reflux precautions were ordered, and Asher's crib was inclined to the same incline as the RNP (30 degrees) and remained at that incline until he was discharged. (SOMF at ¶ 19.)

On July 26, 2014, Asher was seen by Dr. Gary Freed, an Apnea Consultant, and Mrs. Goodrich again reported the ALTE/BRUE and Asher's reflux history. (*Id.* at ¶ 20.) Dr. Freed's differential diagnosis for the event was (1) possible upper airway obstruction, (2) reflux, (3) urinary tract infection or possible urosepsis due to the elevation in white cells, and (4) "[f]inally, it is important to remember that statistically 40-50 percent of ALTE's have no clear etiology [cause]." (*Id.* at ¶ 21.)

Asher was discharged with a diagnosis of apnea[3] from unknown causes, possibly related to reflux. (*Id.* at ¶ 22.) Ms. Goodrich was instructed to continue to follow reflux precautions including, *inter alia*, elevating the head of Asher's bed. (*Id.*)

Four days later, on July 31, 2014, Asher was seen for the first time following the incident by his pediatrician, Dr. Michael Hilton. (*Id.* at ¶ 23.) Ms. Goodrich again reported that Asher continued to spit up at least once after each feeding in small amounts. (Ex. J, at PED_ASSOC_MED_00227-28.) Asher's physical exam was normal, but during the examination, Asher spit up at least three times and had a choking episode while lying on his back in Dr. Hilton's office. (SOMF at ¶ 23.) Dr. Hilton's assessment was that the July 25 event was an apneic episode of uncertain etiology; Dr. Hilton then diagnosed Asher with gastroesophageal reflux disease[4] and started him on Zantac (which controls reflux). (*Id.* at ¶ 24.) On August 27, 2014, during a visit with Dr. Freed, Mrs. Goodrich reported that Asher had a single episode of gagging, two episodes of choking, and that he continued to spit up frequently; Dr. Freed's impression was reflux. (Ex. J at CHOA_CERT_MED_000186-88.) In a letter dated that same day to Dr. Hilton, Dr. Freed noted that the gagging and choking episodes "sound like classic reflux

---

[3] Apnea is a temporary cessation of breathing, especially during sleeping.
[4] Gastroesophageal Reflux or Gastroesophageal Reflux Disease (GER or GERD) is the backward flow of the contents of the stomach into the esophagus.

events." (SOMF at ¶ 25.)

After taking the prescribed reflux medication and continuing to sleep in an elevated crib for a year following the incident, Asher has had no more breathing interruption events. (*Id.* at ¶ 26.) Dr. Hilton, Asher's pediatrician, has also testified that there is no evidence of any abnormal growth or development following the incident. (*Id.* at ¶ 27.) Furthermore, Plaintiffs' expert, Roy Benaroch, M.D., did not review any medical records following Asher's discharge from the hospital and holds no opinion as to Asher's growth and development following the incident, nor did he provide an opinion on the subject in his expert report. (*Id.* at ¶ 28.)

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate upon showing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that

element. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

As demonstrated in this Memorandum, there are no genuine issues regarding any facts material to Plaintiffs' claims and Fisher-Price is entitled to judgment as a matter of law.

## IV.    ARGUMENT AND CITATION OF AUTHORITY

### A. Fisher-Price Is Entitled to Summary Judgment on Plaintiffs' Claims Because Plaintiffs Lack Admissible Expert Testimony Necessary to Prove Proximate Causation and Defect.

Fisher-Price is entitled to summary judgment on all of Plaintiffs' substantive products liability claims because Plaintiffs have failed to establish defect and causation through admissible expert testimony. Plaintiffs in this case assert claims for: strict liability (Count I), negligence (Count II), gross negligence (Count III), failure to warn/inadequate warning (Count IV), and punitive damages (Count V). (*See* Pls.' Compl. (Doc. 1-1).)

An essential element of each of these counts is causation. "Under Georgia products liability law, a plaintiff must prove as part of his prima facie case that the defendant's product was the proximate cause of the injuries alleged." *Wheeler v. Novartis Pharm. Corp.*, 944 F. Supp. 2d 1344, 1352 (S.D. Ga. 2013). "In products

12

liability cases, proof of causation generally requires reliable expert testimony." *Id.*
Where the inference that a defendant's product can and did cause the plaintiff's
specific injury "is not a natural inference that a juror could make through human
experience, [] medical expert testimony is essential to prove causation." *Id.* (citing
*Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1320 (11th Cir. 1999) (applying
Georgia law)). "Thus, in order to survive summary judgment," Plaintiffs must
present a competent expert who can testify "to a reasonable degree of medical
certainty" that the Rock 'N Play caused Asher's injuries. *Id.*

As presented in Fisher-Price's contemporaneously-filed Motions to Exclude
Expert Testimony of Dr. Benaroch and Mr. Gaudreau, which are incorporated fully
herein, Plaintiffs lack the required expert testimony to survive summary judgment
on their claims.[5] Plaintiffs' entire theory of defect and causation is that infant
inclined sleep of 30 degrees can cause airway compromise and that the design and
manufacture of the Rock 'N Play with an inclined sleep surface of 30 degrees did
in fact cause Asher's airway to be compromised resulting in his breathing
interruption. This "is not a natural inference that a juror could make through
human experience. Therefore, medical expert testimony is essential." *Wheeler*, 944

---

[5] Fisher-Price submits that if the Court grants its Motion to Exclude Expert
Testimony of Roy Benaroch, M.D., it will be unnecessary for the Court to address
its Motion to Exclude Expert Testimony of Paul Gaudreau because he can offer no
opinion on medical causation (general or specific), as he is not a doctor.

F. Supp. 2d at 1352; *Allison*, 184 F.3d at 1320. Yet Plaintiffs have no reliable expert testimony that inclined sleep at 30 degrees can or did cause Asher's breathing interruption "to a reasonable degree of medical certainty," *id.*, and no such evidence exists in the world's literature or elsewhere in the record.

Accordingly, without admissible expert testimony on causation, summary judgment should be granted in favor of Fisher-Price on Plaintiffs' strict liability, negligence, gross negligence, and failure to warn claims (Counts I, II, III, IV). *See, e.g.*, *Wheeler*, 944 F. Supp. 2d at 1352 (granting summary judgment on strict liability claims where there was no expert testimony on causation); *Wheat v. Sofamor, S.N.C.*, 46 F. Supp. 2d 1351, 1362 (N.D. Ga. 1999) (excluding plaintiffs' expert and granting summary judgment on strict liability and negligence claims "because of the absence of evidence creating a genuine issue of fact on causation").

Likewise, Plaintiffs' products liability claims also fail because they lack admissible expert testimony establishing that Asher's alleged injuries were proximately caused by a *defect* in the Rock 'N Play that existed when the product was sold. To "prevail in a Georgia products liability action, whether based on negligence or strict liability, a plaintiff must show that the proximate cause of the injury was a defect which existed when the product was sold." *Carmical v. Bell Helicopter Textron, Inc., a Subsidiary of Textron, Inc.*, 117 F.3d 490, 494 (11th

Cir. 1997) (citations omitted); *Udoinyion v. Michelin N. Am., Inc*., 313 Ga. App. 248, 250, 721 S.E.2d 190, 193 (2011) ("The existence of a defect in the product is an essential element of a products liability claim, whether brought under a theory of strict liability or of negligence."); *Wheat*, 46 F. Supp. 2d at 1360 (citation omitted) ("[U]nder Georgia law there is no liability for an 'unreasonably dangerous' product absent some defect or defective condition.").

Expert testimony is necessary for Plaintiffs to establish a disputed material fact to defeat summary judgment because the existence of a defect in the design or manufacture of the Rock n' Play as well as the fact that the defect was a proximate cause of Plaintiff's injuries "is not an inference a jury can reasonably draw solely from human experience." *Meade v. Ford Motor Co*., No. 1:09-CV-1833-TWT, 2011 WL 4402539, at *2 (N.D. Ga. Sept. 20, 2011) (citation omitted) ("[O]nly experts may offer competent evidence of a [] design or manufacturing defect."); *accord Justice v. Ford Motor Co.*, No. 1:07-CV-928-TWT, 2012 WL 2513495, at *2 (N.D. Ga. June 27, 2012). Here, again, Plaintiffs' theory of defect is that the design and manufacture of the Rock 'N Play with an inclined sleep surface of 30 degrees can cause airway compromise. Yet, as demonstrated in Fisher-Price's Motions to Exclude Testimony of Dr. Benaroch and Mr. Gaudreau, Plaintiffs lack reliable expert testimony to establish that this is a defect in the Rock 'N Play and

that that defect proximately caused Asher's interrupted breathing on July 25, 2014.

Accordingly, on the independent ground that Plaintiffs lack admissible expert testimony on defect, summary judgment should be granted in favor of Fisher-Price on Plaintiffs' strict liability, negligence, and gross negligence claims (Counts I, II, III). *See, e.g.*, *Justice*, 2012 WL 2513495, at *4 (granting summary judgment on plaintiffs' strict liability and negligence claims where plaintiff lacked expert evidence on design or manufacturing defect and causation); *Meade*, 2011 WL 4402539, at **2-3 (same); *Wheat*, 46 F. Supp. 2d at 1361-62 (excluding plaintiffs' expert and granting summary judgment on strict liability claims because "there is no reliable evidence of a defect and no reliable evidence that any alleged defect caused an injury.").[6]

## B. Plaintiffs' Manufacturing Defect Claims (Counts I-III) Fail.

Summary judgment is also proper on Plaintiffs' claims predicated on a manufacturing defect (Counts I, II, III) because there is no evidence establishing the Rock N' Play deviated from its manufacturing or design specifications or from otherwise identical units manufactured to the same specifications. (SOMF at ¶ 32); *see, e.g.*, *Jones v. Amazing Prods., Inc.*, 231 F. Supp. 2d 1228, 1236 (N.D. Ga.

---

[6] Summary judgment is appropriate on Plaintiffs' prayer for relief requiring Fisher-Price to issue a recall of the Rock 'N Play because there is no private right of action to enforce the Consumer Product Safety Act (CPSA). *See* 15 U.S.C. §§ 2064(c); 2061(b).

2002) (summary judgment proper where plaintiff presents "no evidence to support the contention that the product had a manufacturing error specific only to [it, or that it] was not manufactured in accordance with its design"); O.C.G.A. § 51-1-11(b)(1). Lacking such evidence, Plaintiffs' manufacturing defect claims fail *even if* Plaintiffs' experts are not excluded.

## C. Plaintiffs' Failure to Warn/Inadequate Warning Claim (Counts IV) Fails.

Summary judgment is also proper on Plaintiffs' failure to warn/inadequate warning claim (Count IV) because Plaintiffs never read the warnings, (*see* SOMF at ¶ 10), and because such warnings were adequately communicated on the RNP itself, and in the Consumer Information provided with it, in compliance with the specific language, location, and conspicuousness standards set forth in ASTM standard F2194-07. (*Id.* at ¶¶ 2, 4, 10); *see, e.g.*, *Shelton v. GALCO Int'l, Ltd.*, No. 3:16-CV-00033-TCB, 2017 WL 3597497, at *7 (N.D. Ga. July 19, 2017) ("[A] plaintiff's failure to read a product's warning bars his claim as a matter of law."); *Puckett v. Plastics Grp., Inc*., No. 1:11-CV-1120-TCB, 2013 WL 11904721, at *10 (N.D. Ga. Jan. 17, 2013) ("If the evidence shows that [plaintiff] noticed the warning on the [product] but chose not to read it, he cannot recover on the basis that the warning was not properly communicated."), *aff'd*, 561 F. App'x 865 (11th Cir. 2014); *Ivy v. Ford Motor Co*., No. 1:08-CV-2078-TCB, 2010 WL 9115838, at

**13–14 (N.D. Ga. Jan. 22, 2010) (finding plaintiff "failed to establish a failure to warn claim arising from an inadequately located or presented warning [where she] provided no proof that the location or presentation of the [] warnings were lacking."), *aff'd*, 646 F.3d 769 (11th Cir. 2011). Indeed, in this case Plaintiffs not only neglected to read the conspicuous warnings affixed to the Rock 'N Play, they expressly declined to use the restraint system provided with the product, believing it to be "dumb." (SOMF at ¶ 13.) On these undisputed facts, there is no plausible failure to warn claim.

**D. Plaintiffs' Gross Negligence Claim (Count III) Fails.**

Summary judgment is proper on Plaintiffs' gross negligence claim (Count III) because there is nothing in the record from which a reasonable jury could conclude that Fisher-Price "acted without even slight care." *W. Asset Mgmt., Inc. v. NW Parkway, LLC*, 336 Ga. App. 775, 790–91, 784 S.E.2d 147, 160 (2016) (trial court erred in denying summary judgment on gross negligence claim where plaintiff failed to identify any evidence that the defendant "acted without even slight care"); *McClesky v. Vericon Res., Inc.*, 264 Ga. App. 31, 33, 589 S.E.2d 854, 856 (2003) (affirming summary judgment on gross negligence claim where nothing in the record could "remotely [] be considered evidence of gross negligence"); O.C.G.A. § 51-1-4. Indeed, the undisputed evidence shows that

18

Fisher-Price exercised due care by adhering in all respects to the safety standards and regulations applicable to the Rock 'N Play and by providing both written instructions for use of the product and affixing warnings and instructions related to the product on the product itself. (*See* SOMF ¶¶ 2-8, 10.)

## E. Fisher-Price Is Entitled to Summary Judgment on Plaintiffs' Punitive Damages Claim.

As shown above, Fisher-Price is entitled to summary judgment on all of Plaintiffs' substantive products liability claims. Thus, Plaintiffs' punitive damages claim must also be dismissed because, under Georgia law, once the underlying claims alleging tort liability have been disposed of, a plaintiff does not have a free-standing actionable claim for punitive damages. *See, e.g.*, *Meade*, 2011 WL 4402539, at *3 ("As the underlying claims of strict liability and negligence have been dismissed, punitive damages recovery is inappropriate."); *S. Gen. Ins. Co. v. Holt*, 262 Ga. 267, 269, 416 S.E.2d 274, 276–77 (1992) (citations omitted) ("[A] claim for punitive damages has efficacy only if there is a valid claim for actual damages to which it could attach. Punitive damages may not be recovered where there is no entitlement to compensatory damages.").

In the event this Court does not grant summary judgment on Plaintiffs' tort claims, Fisher-Price is still entitled to summary judgment on Plaintiffs' claim for punitive damages, because Plaintiffs do not have sufficient evidence to create a

material question of fact as to whether Fisher-Price's conduct rose to the level of misconduct necessary to sustain an award of punitive damages under Georgia law. Plaintiffs must show "clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to the consequences." O.C.G.A. § 51-12-5.1(b). "[C]onscious indifference to consequences means an intentional disregard for the rights of another, knowingly or willfully;" indeed, under Georgia law, even clear and convincing evidence of gross negligence will not support an award of punitive damages. *COMCAST Corp. v. Warren*, 286 Ga. App. 835, 839, 650 S.E.2d 307, 311 (2007).

Moreover, the "general rule" in Georgia is that punitive damages are improper when a defendant manufacturer has complied with applicable safety regulations. *Stone Man, Inc. v. Green*, 263 Ga. 470, 471-72, 435 S.E.2d 205, 206 (1993) (reversing award of punitive damages where defendant complied with county, state, and federal environmental and safety regulations). This is because "such compliance does tend to show that there is no clear and convincing evidence of 'willful misconduct, malice, fraud, oppression, or that entire want of care which would raise the presumption of a conscious indifference to [the] consequences.'" *Id.* (citation omitted); *accord Barger v. Garden Way, Inc.*, 231 Ga. App. 723, 728,

499 S.E.2d 737, 743 (1998); *see also Mims v. Wright Med. Tech., Inc*., No. 1:11-CV-213-TWT, 2012 WL 1681810, at *5 (N.D. Ga. May 11, 2012) (granting summary judgment on plaintiff's punitive damages claim where plaintiff's expert agreed the product complied with regulatory standards); *Welch v. Gen. Motors Corp*., 949 F. Supp. 843, 846 (N.D. Ga. 1996) (same).

Punitive damages are not warranted in this case because there is no evidence that Fisher-Price acted with the malice, fraud, oppression, or entire want of care necessary to sustain an award of punitive damages. O.C.G.A. § 51-12-5.1(b). Instead, Fisher-Price complied in all respects with the applicable safety standards and regulations for the Rock 'N Play, which at the time of its design, development, and first sale was ASTM F2194-07. (SOMF ¶ 2.) These industry standards were developed by ASTM International's Subcommittee F15.18, whose membership includes employees of the CPSC, the AAP, and other consumer safety groups, as well as manufacturers, and served as a guide to manufacturers on the design and safety profile of these products. (*Id.* at ¶ 3.) The undisputed evidence in this case shows that the subject Rock 'N Play involved in Plaintiff's incident was designed, manufactured, and labeled in accordance with this industry standard, as confirmed by test results from third party testing institutions. (*Id.* at ¶ 4.)

The Rock 'N Play also continues to comply with ASTM's revised standards

(F2194-10, F3118-15, F3118-17) applicable to the product even after its market release, as well as the CPSC's proposed safety regulation adopting the safety standards found in F3118-17 as a mandatory safety rule under the Consumer Product Safety Act (CPSA). (*Id.* at ¶¶ 5-7.) As prescribed by the Notice of Proposed Rulemaking, the comment period on the new inclined sleep regulation has closed, and it is expected that the final rule will be issued in due course later this year. Indeed, Plaintiffs' own expert, Paul Gaudreau, acknowledges that the Rock 'N Play was tested and found to be compliant with ASTM standard F2194-07, and currently complies with the new ASTM standards (F3118) governing infant inclined sleep products. (*Id.* at ¶ 8.)

In light of Fisher-Price's compliance with industry standards and the proposed safety regulation, Plaintiffs have no admissible evidence to overcome Georgia's "general rule" and prove, "by clear and convincing evidence that [Fisher-Price] engaged in a deliberate course of conduct which knowingly endangered those using the product." *Barger*, 499 S.E.2d at 743; *Mims*, 2012 WL 1681810, at *5; *Welch*, 949 F. Supp. at 846. Furthermore, there is no evidence in this case that Fisher-Price intentionally disregarded Plaintiffs' rights, which is necessary to show a "conscious indifference to consequences," *COMCAST*, 650 S.E.2d at 311. Accordingly, summary judgment should be granted in Fisher-Price's

favor on Plaintiffs' punitive damages claim.

**F. Fisher-Price Is Entitled to Summary Judgment on Plaintiffs' Claims for Future Medical Expenses and Pain and Suffering.**

As shown above, Fisher-Price is entitled to summary judgment on all of Plaintiffs' claims. But even if this Court were to find that a genuine question of fact exists as to any of these claims, Plaintiffs' claims for future medical expenses and pain and suffering fail due to lack of any competent evidence. "To warrant future medical expenses, there must be evidence that the injury will require that future medical attention." *Massie v. Ross*, 211 Ga. App. 354, 354, 439 S.E.2d 3, 3 (1993). Additionally, "[a]n award of future medical costs must be supported by competent evidence to guide the jury in arriving at a reasonable value for such expenses." *Bennett v. Moore*, 312 Ga. App. 445, 457, 718 S.E.2d 311, 320 (2011).

"Where no evidence is presented from which the jury can ascertain except by mere speculation and conjecture that [plaintiff] would ever have future medical expenses, a charge on this subject is erroneous." *Womack v. Burgess*, 200 Ga. App. 347, 347, 408 S.E.2d 159, 160 (1991) (citations omitted) (trial court erred in submitting to the jury the issue of future medical expenses where expert testimony was "too inconclusive and conjectural to form the basis of a claim for future medical expense."); *accord Bennett*, 718 S.E.2d at 320 (same); *see also Head v. Target Corp.*, No. 4:09-CV-0012-HLM, 2009 WL 10664782, at *4 (N.D. Ga.

2009) (finding plaintiff's evidence "too speculative to authorize an award of future medical expenses associated with [future knee replacement] surgery" where plaintiff's physician could not state "to a reasonable degree of medical certainty, that Plaintiff will need a future knee replacement").

There is simply no competent evidence of any kind in this case that Asher will require any future medical attention or incur any future medical expenses associated with the event he experienced while lying in the Rock 'N Play. In fact, the undisputed evidence in this case belies such a claim. All examinations and reviews of Asher's condition immediately following the event were completely normal except for two unrelated findings, both of which completely resolved. (SOMF at ¶¶ 17, 18; Ex. J at GOODRICH_A_000080.) After taking reflux medication and sleeping in an elevated crib for a year, Asher has had no more apneic events. (SOMF at ¶ 26.) Dr. Hilton, Asher's pediatrician, has testified that there is no evidence of any abnormal growth or development following the incident. (*Id.* at ¶ 27.) And Plaintiffs' expert, Dr. Benaroch, did not review any medical records following Asher's discharge from the hospital and holds no opinion as to Asher's growth and development following the incident, nor did he provide an opinion on the subject in his expert report. (*Id.* at ¶ 28.)

Furthermore, Plaintiffs have no admissible expert testimony to a "reasonable

degree of medical certainty" that Asher will need future medical attention or the amount of future medical expenses. *See Head*, 2009 WL 10664782, at *4; *Womack*, 408 S.E.2d at 160. In fact, Plaintiffs' experts are silent on this issue, providing no opinion at all. Instead, Plaintiffs hope to submit this case to the jury based only on mere speculation or conjecture that Asher will need future medical treatment, and "the amount thereof," which is insufficient evidence as a matter of law. *See, e.g.*, *Bennett*, 718 S.E.2d at 320; *Womack*, 408 S.E.2d at 160.

Finally, Plaintiffs' claim for pain and suffering fails as a matter of law because it is undisputed that Asher was asleep and not conscious at the time he experienced the subject event. It is axiomatic that "[d]amages for pain and suffering are permitted only for pain and suffering that is conscious." 25A C.J.S. *Death* § 279 (2018); *see, e.g.*, *Curtis v. United States*, 274 F. Supp. 3d 1366 (N.D. Ga. 2017) (holding that plaintiff-estate could not recover for post-impact pain and suffering where the evidence did not establish that decedent was conscious). Therefore, Plaintiffs are not entitled to recover for Asher's alleged pain and suffering associated with the incident.

## V.    <u>CONCLUSION</u>

For the reasons stated herein, this Court should grant Fisher-Price's motion for summary judgment as to all of Plaintiffs' claims.

Respectfully submitted this 30th day of April, 2018.

/s/ Richard K. Hines, V
Richard K. Hines, V
Georgia Bar No. 356300
richard.hines@nelsonmullins.com
Peter L. Munk
Georgia Bar No. 451809
peter.munk@nelsonmullins.com
NELSON MULLINS RILEY &
SCARBOROUGH LLP
201 17th Street, NW, Suite 1700
Atlanta, GA 30363
PH: (404) 322-6000

*Attorneys for Defendant Fisher-Price, Inc.*

## Certificate of Compliance

In accordance with Local Rule 7.1D, this is to certify that this brief has been prepared with one of the fonts and points approved by the Court in LR 5.1B, i.e., 14 point, Times New Roman font, and that the brief does not contain more than 10 characters per inch of type .

This 30th day of April, 2018.

/s/ Richard K. Hines, V
Richard K. Hines, V
Georgia Bar No. 356300

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically served this **DEFENDANT FISHER-PRICE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** upon the following counsel of record:

Kevin T. Moore, Esq.
Kevin T. Moore, P.C.
6111 Peachtree Dunwoody Road, NE
Building C, Suite 201
Atlanta, GA 30328
ktm@ktmtriallaw.com

Jan V. Hinson
Law Offices of Jan V. Hinson, P.C.
11175 Cicero Drive, Suite 100
Alpharetta, Georgia 20022
jan@janhinsonlaw.com

This 30th day of April, 2018.

*/s/ Richard K. Hines, V*
Richard K. Hines, V
Georgia Bar No. 356300