## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| DAVID GOODRICH and | ) | |
| COURTNEY GOODRICH, | ) | |
| Individually and as Next Friends of | ) | |
| ASHER LUKE GOODRICH, a minor, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION FILE NO. |
| | ) | |
| v. | ) | 1:16-CV-03116-TWT |
| | ) | |
| FISHER-PRICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT FISHER-PRICE, INC.'S STATEMENT OF MATERIAL FACTS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Pursuant to Federal Rule of Civil Procedure 56(c), and Local Rule 56.1B(1), Defendant Fisher-Price, Inc. ("Fisher-Price") submits this Statement of Material Facts to Which There is No Genuine Issue to be Tried In Support of its Motion for Summary Judgment on all claims brought against it by Plaintiffs David Goodrich and Courtney Goodrich, individually and as next friends of Asher Luke Goodrich, a minor.

1.     The Fisher-Price Rock 'N Play Sleeper (the "RNP" or "Rock 'N Play") is an infant inclined sleep product. Rock 'N Plays, as shown in the image of

the Goodrich Rock 'N Play below, are designed so that an infant rests flat on his or her back at an incline of no more than 30 degrees when measured in accordance with ASTM International standard F3118.



2.      At the time of its design, development, and first sale the Fisher-Price Rock 'N Play Sleeper complied in all respects with ASTM International standard F2194-07, which was the cradle and bassinet standard applicable to the RNP at the time.  (Ex. A, FPI_000018-26.)

3.      This standard was developed by ASTM International's Committee F15 on Consumer Products -- specifically Subcommittee F15.18 on Cribs, Toddler Beds, Play Yards, Bassinets, Cradles and Changing Tables, whose membership includes employees of  the U.S. Consumer Product Safety Commission ("CPSC"), the American Academy of Pediatrics ("AAP"), and other consumer safety groups, as well as manufacturers.  (Ex. A, FPI_000018.)

4.    The Rock 'N Play Sleeper was designed, manufactured, and labeled in compliance with the standards applicable to this infant product at the time: ASTM International Designation: F2194-07, as confirmed by test results from third party testing institutions Bureau Veritas and SGS.  (Ex. B, FPI_000541-48.)

5.    The Rock 'N Play Sleeper also complied with the revised standard, F2194-10, that ASTM issued in April 2010.   (Ex. C, FPI_000071-77.) The Goodrich Rock 'N Play complied with this standard.

6.    In May 2015, ASTM, in conjunction with CPSC, issued a new standard (F3118-15) governing infant inclined sleep products, which are defined in section 3.1.6 as "a freestanding product, intended to provide a sleeping accommodations for an infant up to approximately 5 months of age, that is supported by a stationary or rocker base with one or more inclined sleep surface positions for the seat back that are greater than 10 degrees and do not exceed 30 degrees from the horizontal."  (Ex. D, FPI_000089-105.) The Goodrich Rock 'N Play sleep angle complies with this standard when measured in accordance with the standard.

7.    In April 2017, CPSC issued a notice of proposed rulemaking proposing to adopt the safety standards found in ASTM Standard F3118-17 (the most current revision) as a mandatory safety rule under the Consumer Product

Safety Act (CPSA), which will be issued in due course later this year.  *See* Safety Standard for Infant Inclined Sleep Products, 82 Fed. Reg. 16963 *et seq*. (proposed April 7, 2017) (to be codified at 16 C.F.R. pts 1112, 1130, 1236).  The Goodrich Rock 'N Play sleep angle complies with this proposed regulation when measured in accordance with the regulation.

8.    Plaintiffs' own expert, Paul Gaudreau, acknowledges that the Rock 'N Play Sleeper was tested and found to be compliant with F2194-07, and currently complies with the new ASTM standards (F3118) governing infant inclined sleep products.  (Ex. E, November 28, 2017, Paul Gaudreau, Jr. Deposition Transcript ("Gaudreau Dep. Tr.") at 90:8 to 91:16.)

9.    Plaintiffs  David Goodrich and Courtney Goodrich were given a used Rock 'N Play by their neighbor a few weeks prior to the July 25, 2014 event that is the subject of this litigation. (Ex. F, March 21, 2017 Courtney Goodrich Deposition Transcript ("Goodrich Dep. Tr.") at 18:11 to 19:14.)

10.    Plaintiffs did not receive the Consumer Information (use instructions) that accompanied the Rock 'N Play from their neighbor and, prior to the event, never read the warnings affixed to the Rock 'N Play itself.  (Ex. F, Goodrich Dep. Tr. at 37:3 to 38:19; 148:11 to 149:11; Ex. G, FPI_000017; Ex. H, FPI_000029-40.)

11.    On July 25, 2014, Plaintiff Courtney Goodrich, a school teacher, visited her first grade classroom to prepare the classroom for the upcoming school year with her son, Minor Plaintiff Asher Goodrich, a seven week old newborn, and her son's grandmother, Ms. Jan Hinson, co-counsel for Plaintiffs.  (Ex. F, Goodrich Dep. Tr. at 22:4-21.)

12.    Following lunch away from school, Mrs. Goodrich, Ms. Hinson and Asher returned to the classroom.  Asher fell asleep in his car seat during the drive, and upon their arrival at the classroom, Asher was transferred while still asleep to the Rock 'N Play by Mrs. Goodrich and Ms. Hinson at around 2:15 P.M.  (Ex. F, Goodrich Dep. Tr. at 22:19 to 23:15; 26:3 to 29:25; Ex. I, October 26, 2017 Jan Hinson Deposition Transcript ("Hinson Dep. Tr.") at 34:13 to 35:4)

13.    At the time of the transfer, Mrs. Goodrich and Ms. Hinson started to use the restraint system consisting of a crotch strap and snap waist belts, but thinking the restraint system was "dumb," did not strap Asher into the RNP.  (Ex. F, Goodrich Dep. Tr. at 30:5 to 31:24.)

14.    At the time of the transfer, Mrs. Goodrich and Ms. Hinson placed a receiving blanket in the crib and tucked it around Asher.  (Ex. F, Goodrich Dep. Tr. at 30:15-17.)

15.    At around 3:15 P.M., while Mrs. Goodrich was out of the room, Ms. Hinson observed an Apparent Life Threatening Event ("ALTE")/Brief Resolved Unexplained Event ("BRUE") in Asher.  (Ex. I, Hinson Dep. Tr. at 78:24 to 82:8.)

16.    Ms. Hinson testified that Asher was limp, and blue around the eyes and lips. Ms. Hinson picked Asher up, and Asher started to breathe again. (Ex. I, Hinson Dep. Tr. at 65:2 to 66:6; 67:15-20.)

17.    Asher was admitted to the ER at Hughes Spalding where test results for all of his systems were completely normal with the exception of an elevation of white cells in the blood, which later completely resolved. His physical exam was normal; his oxygen saturation was 100% indicating no cyanosis (no blueness); his liver function tests were within normal range and the $CO_2$ electrolytes were within normal range; Asher's urine analysis was significant for 6-10 white blood cells and a lumbar puncture was ordered to rule out infection, and was attempted three times. (Ex. J, Selected Plaintiff Medical Records, at GOODRICH_A_000014, 16-21, 26, 27).

18.    Asher was later transferred to CHOA's Egleston Hospital around 11:00 P.M., where he was again examined: his oxygen saturation was 100% indicating no cyanosis (no blueness), and he appeared well and alert. (Ex. J, Selected Plaintiff Medical Records, at GOODRICH_A_000070-81).

6

19.   While in the hospital, because of his reflux history, reflux precautions were ordered, and Asher's crib was inclined to 30 degrees, and remained at 30 degrees until he was discharged.  (Ex. J, Selected Plaintiff Medical Records, at CHOA_CERT_MED_000145).

20.   On July 26, 2014, Asher was seen by Dr. Gary E. Freed, an Apnea Consultant, and Mrs. Goodrich again reported the ALTE/BRUE and Asher's reflux history.  (Ex. J, Selected Plaintiff Medical Records, at GOODRICH_A_000081-88).

21.   Dr. Freed's differential diagnosis for the event was a possible upper airway obstruction, and a urinary tract infection or possible urosepsis due to the elevation in white cells. "Finally, it is important to remember that statistically 40-50 percent of ALTE's have no clear etiology [cause]." (Ex. J, Selected Plaintiff Medical Records, at GOODRICH_A_000086).

22.   Asher was discharged with a diagnosis of apnea from unknown causes, possibly related to reflux.  Ms. Goodrich was instructed to continue to follow reflux precautions including elevating the head of Asher's bed. (Ex. J, Selected Plaintiff Medical Records, at GOODRICH_A_000075).

23.   On July 31, 2014, Asher was seen for the first time following the incident by his pediatrician, Dr. Michael Hilton. Asher's physical exam was

7

normal, but during the examination, Asher spit up at least three times and had a choking episode while lying on his back in Dr. Hilton's office.  (Ex. J, Selected Plaintiff Medical Records, at PED_ASSOC_MED_00227-28).

24.    Dr. Hilton's assessment was that Asher had an apneic episode on July 25, 2014 of uncertain etiology; Dr. Hilton diagnosed Asher with GERD and started him on Zantac.    (Ex.  J,  Selected  Plaintiff  Medical  Records,  at PED_ASSOC_MED_00227-28).

25.    Mrs. Goodrich and Asher visited Dr. Freed on August 27, 2014. In a letter dated August 27, 2014 to Dr. Hilton, Dr. Freed noted that the gagging and choking episodes "sound like classic reflux events."  (Ex. J, Selected Plaintiff Medical Records, at CHOA_CERT_MED_000201).

26.    After taking the prescribed reflux medication and continuing to sleep in an elevated crib for a year, Asher has had no more apneic episodes. (Ex. F, Goodrich Dep. Tr. at 91:25 to 92:11.)

27.    Dr. Hilton, Asher's pediatrician, has testified that there is no evidence of any abnormal growth or development following the incident.  (Ex. K, September 19, 2017 Dr. Hilton Deposition Transcript ("Dr. Hilton Dep. Tr.") at 86:24 to 87:8; 97:12-25).

28.    Plaintiffs' expert, Roy Benaroch, M.D., did not review any medical records following Asher's discharge from the hospital and holds no opinion as to Asher's growth and development following the incident, nor did he provide an opinion on the subject in his expert report. (Ex. L, October 24, 2017 Roy Benaroch, M.D. Deposition Transcript ("Benaroch Dep. Tr."), at 42:16 to 43:11).

29.    In November 2011, the AAP issued a policy statement with a series of recommendations for infant sleeping environments.  (Ex. M, American Academy of Pediatrics, *SIDS and Other Sleep-Related Infant Deaths: Expansion of Recommendations for a Safe Infant Sleeping Environment*, Vol. 128, No. 5 PEDIATRICS 1030 (November 2011) ("AAP Statement").)

30.    One such recommendation was that "Elevating the head of the infant's crib while the infant is supine is not recommended," citing to Tobin, *et al.*, *Posture and gastro-esophageal reflux: a case for left lateral positioning*, 76 Arch Disease in Childhood 254-58 (1997).  "It is ineffective in reducing gastroesophageal reflux; in addition, it might result in the infant sliding to the foot of the crib into a position that might compromise respiration."  (Ex. M, AAP Statement, at 1032.)

31.    Another recommendation articulated in the AAP statement is that "Sitting devices, such as car safety seats, strollers, swings, infant carriers, and infant slings, are not recommended for routine sleep.  Infants who are younger than

4 months are particularly at risk, because they might assume positions that can create risk of suffocation or airway obstruction." (Ex. M, AAP Statement, at 1033.)

32.    There is no evidence in this case establishing the Rock n' Play deviated from Fisher-Price's manufacturing specifications for other Rock 'N Play products in its lot or deviated from its design specifications.

33.    About 3,500 infants die from Sudden Unexplained Death (SUD) or Sudden Infant Death Syndrome (SIDS) each year in the United States. It is the leading cause of death among infants one month to one year of age. It remains unpredictable despite years of research. *See* AAP Task Force on SIDS, *SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment*, 138(5) Pediatrics 1, 1 (2016), *available at* http://pediatrics.aappublications.org/content/early/2016/10/20/peds.2016-2938.

34.    In addition to SUD/SIDS events, there are thousands of events each year in which infants cease breathing for varying periods of time but do not die. These events bear descriptors such as: "Apparent Life Threatening Event" (ALTE); "Brief Resolved Unexplained Event (BRUE)"; "Prolonged Apnea"; and "Near Miss." *See* J. Tieder, *et al*., *Brief Resolved Unexplained Events (Formerly*

*Apparent Life Threatening Events) and Evaluation in Lower-Risk Infants,* 137(5)

Pediatrics e1, e6, e23 (2016), *available at:*

 http://pediatrics.aappublications.org/content/early/2016/04/21/peds.2016-0590.

Respectfully submitted this 30th day of April, 2018.

*/s/ Richard K. Hines, V*
Richard K. Hines, V
Georgia Bar No. 356300
richard.hines@nelsonmullins.com
Peter L. Munk
Georgia Bar No. 451809
peter.munk@nelsonmullins.com
NELSON MULLINS RILEY &
 SCARBOROUGH LLP
201 17th Street, NW, Suite 1700
Atlanta, GA  30363
PH: (404) 322-6000

*Attorneys for Defendant Fisher-Price, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically served this **DEFENDANT FISHER-PRICE, INC.'S STATEMENT OF MATERIAL FACTS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED** upon the following counsel of record:

Kevin T. Moore, Esq.
Kevin T. Moore, P.C.
6111 Peachtree Dunwoody Road, NE
Building C, Suite 201
Atlanta, GA 30328
ktm@ktmtriallaw.com

Jan V. Hinson
Law Offices of Jan V. Hinson, P.C.
11175 Cicero Drive, Suite 100
Alpharetta, Georgia 20022
jan@janhinsonlaw.com

This 30th day of April, 2018.

/s/ Richard K. Hines, V
Richard K. Hines, V
Georgia Bar No. 356300