IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DAVID GOODRICH and
COURTNEY GOODRICH,
Individually and as Next Friends of
ASHER LUKE GOODRICH, a minor,

Plaintiffs,

v. CIVIL ACTION FILE NO. 1:16-CV-03116-TWT

FISHER PRICE, INC.,

Defendant.

---------------------------------------------------

VIDEOTAPED DEPOSITION OF

INEZ M. TENENBAUM

---------------------------------------------------

DATE TAKEN: Wednesday, February 28, 2018

TIME BEGAN: 10:15 a.m.

TIME ENDED: 11:37 a.m.

LOCATION: Nelson, Mullins, Riley & Scarborough, LLP
1320 Main Street, 17th Floor
Columbia, South Carolina

REPORTED BY: Yvonne R. Thurston-Bohannon
Registered Merit Reporter, Certified Realtime Reporter, Georgia Certified Court Reporter

APPEARANCES:

ATTORNEYS FOR THE PLAINTIFFS
DAVID GOODRICH and COURTNEY GOODRICH,
Individually and as Next Friends of ASHER
LUKE GOODRICH, a minor:

KEVIN T. MOORE, PC
BY: KEVN T. MOORE
BY: JAN HINSON
6111 Peachtree Dunwoody Road
Building C, Suite 201
Atlanta, Georgia 30328
(770) 396-3622
ktm@ktmtriallaw.com

ATTORNEYS FOR THE DEFENDANT
FISHER PRICE, INC.:

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP
BY: RICHARD K. HINES, V
Atlantic Station
201 17th Street Northwest, Suite 1700
Atlanta, Georgia 30363
(404) 322-6154
(404) 322-6050 - FAX
richard.hines@nelsonmullins.com

ALSO PRESENT:

Donald Graves, Videographer

I N D E X


| | | Page |
|---|---|---|
| STIPULATIONS | | 4 |
| EXAMINATION BY MR. MOORE | | 5 |
| SIGNATURE OF DEPONENT | | 57 |
| CERTIFICATE OF REPORTER | | 58 |


E X H I B I T S


| | | |
|---|---|---|
| 1 | Notice of Deposition and Notice to Produce of a Non-Party Inez M. Tenenbaum | 4 |
| 2 | December 15, 2017, Expert Witness Report of Inez M. Tenenbaum | 4 |

STIPULATIONS: It is stipulated by and among Counsel that the deponent does not waive the right to read and sign the deposition transcript.

\- - -

(Plaintiff's Exhibit 1, Notice of Deposition and Notice to Produce of a Non-Party Inez M. Tenenbaum, marked for identification.)

(Plaintiff's Exhibit 2, December 15, 2017, Expert Witness Report of Inez M. Tenenbaum, marked for identification.)

THE VIDEOGRAPHER: We're on the record at 10:15. Today's date is February 28th, 2018.

This is video number one of the deposition of Inez M. Tenenbaum taken in the matter of David Goodrich and Courtney Goodrich individually and as next friends of Asher Luke Goodrich, a minor, plaintiffs, versus Fisher-Price, Inc., defendant, In the United States District Court for the Northern District of Georgia, Atlanta Division.

This deposition is being held at 1320 Main Street, Columbia, South Carolina.

My name is Donald Graves. The court reporter is Yvonne Thurston Bohannon. We're with Huseby, Inc.

Will counsel introduce themselves for the record, please.

MR. MOORE: Yes. This is Kevin Moore. I represent David Goodrich and Courtney Goodrich individually and as next friends of Asher Luke Goodrich, and I also am -- have cocounsel, Jan Hinson.

MR. HINES: And I'm Richard Hines on behalf of the defendant Fisher-Price, Inc.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

\- - -

INEZ M. TENENBAUM, after having been first duly sworn, was examined and testified as follows:

\- - -

THE WITNESS: I do.

\- - -

EXAMINATION

\- - -

BY MR. MOORE:

Q. Good morning, Ms. Tenenbaum.

A. Good morning.

Q. My name is Kevin Moore, and this is Jan Hinson, and together we represent David and Courtney which are the parents of Asher. And we'll probably just refer to them in their first names, or I'll refer to Asher as either the -- Asher or the minor child during the course of the deposition.

MR. MOORE: If we could have the same understanding that we had in the previous depositions that this deposition is taken for all purposes allowed under the Federal Rules of Evidence and that all objections will be reserved until time of trial or further use of the deposition, except as to the form of the question and the responsiveness of the answer.

Is that satisfactory with you, sir?

MR. HINES: That is satisfactory. And we will have Ms. Tenenbaum read and sign the deposition prior to the time the court reporter receives --

MR. MOORE: Okay. And you can read and sign before any notary. Thank you.

BY MR. MOORE:

Q. Ms. Tenenbaum, I don't know if you've

had your deposition taken very many times. Have you?

A. Just once.

Q. Just once?

A. In -- in the capacity as an expert witness.

Q. Okay. And it was only in that capacity; you haven't had it taken in any other capacity, individually or personally or anything?

A. None that I can recall.

Q. Oh, okay. I'm just going to refresh your memory as to how it -- how it takes place.

I'm here to gather information from you because you have been designated as an expert witness for the defendant Fisher-Price. I'm going to ask you certain questions, and I'm going to assume that if you answer it, you understood the question. If you don't, just say, "Kevin, I don't understand it the way you asked it," and I'll be glad to rephrase it.

Oftentimes people have a tendency when they answer questions to go "uh-huh" and "uh-uh" --

A. Uh-huh.

Q. -- and then when we go back to try to

read it, Mr. Hines and I, we don't know that it was a yes or no. So as the deposition wears on, if you say, "Uh-huh," and I go, "I need an answer," then I'm not trying to be rude. I'm just saying I need it on the record.
A. Right.
Q. If at any time you want to take a break, just say, "I want to take a break."
I would prefer, though, that if you do that, you do it when there's not a question pending on the table, and -- and if -- let's see here.
Are you on any kind of medication that would prevent you from understanding the questions?
A. No, I'm not on any medication.
Q. Okay. All right. There's not going to be a Perry Mason moment?
A. No.
Q. Okay. You've provided me with certain information, and I just want to ask you questions about it, get a further clarification since you've been designated as an expert in this area.
I was given your report, and I have gone through it, so I'm going to ask you some

general information. Then I'm going to ask you some educational questions, and then some employment questions as a general background for purposes of juries. Then I'm going to get into the report, and that's sort of my outline of where I'm going.

So if you could tell us your full name.

A. Inez Moore Tenenbaum, T-E-N-E-N-B-A-U-M.

Q. And Moore is M double O-R-E?

A. Same as yours.

Q. And what is your office address?

A. It's 801 Gervais Street, Suite B, Columbia, South Carolina, 29201.

Q. And is that at the law firm of the Wyche Law Firm?

A. Yes.

Q. And what is your marital status?

A. Married.

Q. Okay. Do you have children over the age of 18?

A. No.

Q. All right. Do you have any relatives that live in Atlanta, Georgia, in the northern

district?
A. I have a nephew and -- who lives with his family in Alpharetta.
Q. In Alpharetta?
A. Well, in Cumming.
Q. In Cumming?
A. Uh-huh.
Q. Okay. Could you give me that person's name, please.
A. His name is Andrew Hill. His wife is Nicole Hill, H-I-L-L.
Q. Okay.
A. And my husband has relatives who live in Atlanta.
Q. Okay. And who are they, if you --
A. An --
Q. -- can recall?
A. Andre and Marsha Kessler, K-E-S-S-L-E-R, and Lawrence and Lindsay Kessler.
Q. Can you spell that last name again.
A. K-E-S-S-L-E-R.
Q. All right.
A. And there is a daughter Gina Kessler, and I don't know her married name right offhand or her husband's name.

Q. What is your husband's name?
A. Samuel Tenenbaum. My husband is Samuel Tenenbaum.
Q. Did you grow up in South Carolina?
A. No, I grew up in Pineview, Georgia. Graduated from Hawkinsville, Georgia, high school.
Q. I notice that you went to the University of Georgia.
A. I did. I -- I went to the University of Georgia and have an undergraduate degree in elementary education and a master's degree in education.
Q. And then you received your law degree from the University of South Carolina?
A. Yes.
Q. That was in 1986?
A. I -- yes, that's correct.
Q. And what was your first position out of law school? Did you clerk or did you work for a firm?
A. I was an associate with Boyd, Knolton, Tate & Finley.
Q. And where was that?
A. It's in Columbia, South Carolina, and that firm merged with Sinkler Gibson Simmons, and

it became Boyd -- Sinkler & Boyd. Sinkler & Boyd.

Q. And what did you do for that law firm? What -- other than --

A. I was an associate.

Q. -- other than an associate, what area in law?

A. I did regulatory administrative law and public interest law. For example, when the Department of Social Services was sued in federal court, the federal judge appointed me guardian of the incarcerated youth in that case.

Q. Okay.

A. So I did public interest law and regulatory administrative law, some litigation but not much.

Q. How long were you with that firm?

A. Five years.

Q. Okay. And then where did you go after that?

A. I started a nonprofit organization, the South Carolina Family -- Center for Family Policy. I was involved in a -- that Department of Juvenile Justice case in federal court I just told you. I started this nonprofit to work on reforming the state's juvenile justice system.

Q. Okay. And that was from approximately 1991 till?
A. 1991 until I ran for state superintendent of education in 1998. I don't think it was '91. I think it was -- yeah, I left Sinkler & Boyd in '91, and then I ran for lieutenant governor in '94, so I took some time off. I went back --
Q. So in '98 you ran for superintendent?
A. Of education and won.
Q. I'm sorry?
A. State superintendent of education. I won that election.
Q. Right. Right.
A. So I was there. And then I ran again in 2002 and -- and was reelected. So I was there eight years as state superintendent of education. So in '91 I left Sinkler & Boyd. But I was either running for office or working at this nonprofit organization.
Q. Right.
What was the name of the nonprofit?
A. It was the South Carolina Center for Family Policy.
Q. And so -- so you ran in 1998, and how

long was the state superintendent of education -- is that a four-year --
A. Four-year term.
Q. Four-year term. So '98 to 2002, and then 2002 --
A. To January 2007 when all the new --
Q. -- to 2007?
A. -- when the new superintendent was sworn in.
Q. Okay. All right. And then was it after 2007 you ran for lieutenant governor?
A. No, I ran for lieutenant governor in 1994.
Q. Oh, in 1994. That was -- I see.
That was before you ran for state superintendent?
A. Yes.
Q. After 2007 -- after your tenure --
A. I -- I was an education consultant. I didn't practice law. I worked with the southern -- with various nonprofit organizations and was an education consultant for two years.
Q. Okay. For two years, till 2009?
A. 2009 I was appointed to the U.S. Consumer Product Safety Commission.

Q. By Barack Obama?
A. President Obama.
Q. Had you had any experience with the Consumer Product Safety Commission prior to being appointed as the chairman of the Consumer Product Safety Commission?
A. No, I had not been engaged with that organization -- with that commission prior to that.
Q. Okay. Let me show you what I'm going to first mark as Exhibit Number 1 and see if you've got a copy of that, Ms. Tenenbaum. This is the --
A. Yes, I did.
MR. MOORE: It's just the notice.
MR. HINES: She was sent that electronically.
BY MR. MOORE:
Q. Did you bring any documents with you today?
A. I bought my expert report.
Q. Okay.
MR. HINES: And we brought the file.
MR. MOORE: Yes. Okay. Thank you.
BY MR. MOORE:

Q. So when you worked with the law firm for that five years as an associate, did you work primarily in regulatory matters with governmental entities? Is that what you did?

A. I did. I did environmental law which -- underground storage tanks which was -- were regulated by the Department of Health and Environmental Control. I also did work on Superfund sites and -- and advised companies on the liability for purchasing property that had industrial histories on that property.

Prior to going to law school, though, I worked for the House of Representatives for six years, and during that time, I had extensive regulatory experience with things like lead and paint and other regulations that we considered from the Department of Health and Environmental Control.

Q. So was that after you got your master's in education before you went to law school?

A. Yes.

Q. So if you went to law school in '83 through '86, then you graduated with your master's degree from the University of Georgia --

A. '74.
Q. -- in '70 --
A. 1974.
Q. -- in '74? Okay.
Did you start with the current Wyche Law Firm after your tenure at the CPSC?
A. I was -- was with Nelson Mullins for two years. I joined Nelson Mullins in November of 2013, and I left in -- for two years, and then I left in November of 2015 and joined the Wyche firm -- no, I started my own law firm for a year. So I was Inez Moore Tenenbaum, LLC, for a year, and then a year after that I joined the Wyche firm, 2015.
Q. Okay. So after your tenure as the -- with the Consumer Product Safety Commission, you came back to Columbia?
A. I moved back to Columbia. And, in fact, I commuted every weekend from Columbia to Washington and then came home every weekend. So I came -- lived here and Washington for four and a half years.
I joined Nelson Mullins in November of 2013. I left Nelson Mullins in November 2015 and started my own practice, and then a year after

that, I was invited by Wyche to join them. I'm of counsel with Wyche.

Q. Okay. All right. And that's where you -- that's your current position now?

A. Current position.

Q. I notice that you travel back and forth to the Wyche firm sometimes in Greenville, sometimes in Columbia?

A. I do.

Q. So prior to your education -- or after -- I'm sorry. Strike that.

After your education, getting a law degree and working for the law firms, and until you started your tenure with the Consumer Product Safety Commission, had you had any experience with cribs and car seats and -- from a technical standpoint --

A. No.

Q. -- maybe not from a mom standpoint, but --

A. No.

Q. Okay. All right. And did you have any technical knowledge about bassinets or cradles or crib safety standards?

A. No.

Q. Did you have any knowledge or experience with respect to infant incline sleepers?
A. No.
Q. Okay. Or infant swings?
A. No.
Q. Okay. Or the testing or certification of children's products?
A. No.
Q. Now, what were you asked to do by the defendant Fisher-Price in this case?
A. Well, it's covered in the first paragraph of my report.
Q. Yes, ma'am.
A. That they asked me to discuss the relation -- the process of rulemaking by the U.S. Consumer Product Safety Commission; the relationship between the CPSC and organizations that develop voluntary safety consensus standards for consumer products; and the AST and voluntary safety standards for infant incline sleep products; and the process that CPSC undertakes to determine if a substantial product hazard exists that would prompt CPSC to issue a recall of a product.

So I was asked to be -- to give my testimony on the inner workings of the CPSC, and when the CPSC recalls a product, how voluntary standards are made.

Q. Okay. Well, we're going to go over that.

How is it that Fisher-Price found their way to Inez Tenenbaum, do you know?

A. I'm called by people since I -- companies since I left the CPSC to do a variety of things for companies. I also have been called by plaintiffs' attorneys and have a case involving a plaintiff's case.

Q. Okay. Have you testified as an expert in court before?

A. Not in court.

Q. Have you testified as an expert with respect to -- I noticed one time that you stated that you were involved in a case as an expert, but I don't believe that that dealt with child safety products.

A. No, it was off gassing and hydrogen sulfide. That's what that deals with.

Q. More of a toxic toy-type situation?

A. No. It involved hydrogen sulfide

vapors coming from a landfill, and the plaintiffs maintained that the U.S. Consumer Product Safety Commission required under the Chinese drywall cases that the house be taken down to the studs, and I was asked to be an expert witness to -- for -- clarify what the CPSC required in the remediation of homes contaminated by hydrogen sulfide.

Q. Did you represent the defendant?

A. I do represent the defendant in that case.

Q. All right. Is that still ongoing?

A. That's ongoing.

Q. And do you know who the law firm is that is representing the plaintiff and the defendant?

A. It's a Savannah law firm, and it -- it -- the defendant is Georgia-Pacific, and it's a Savannah law firm.

Q. Okay.

A. It's been a couple years since I gave my deposition.

Q. The case --

A. That's the case.

Q. I'm sorry?

A. That is the case.
Q. Ratner?
A. (Nods head.)
Q. Okay. And you are currently compensated at an hourly rate of a thousand dollars an hour?
A. Yes.
Q. Okay. Well, let's go over your statement.
A. Okay.
Q. And if you want to take a break, you just let me know.
Okay. You were asked to testify as to the relationship -- first paragraph, "the relationship between the Consumer Product Safety Commission and organizations that developed voluntary safety consensus standards for consumer products."
A. Yes.
Q. All right. Tell us what that actually means.
A. There are a number of voluntary standards organizations, ASTM, ANSI, UL, CSA, and most of the products in the United States and the world are covered by voluntary standards, not

mandatory standards. And so typically the -- the CPSC has a number of ongoing voluntary standards being developed in which they work with these organizations.

It's listed annually in the CPSC's annual report in terms of which standards they're working on. So the voluntary standard -- typically CPSC will go to a standards development organization called SDO and have data on injuries, on deaths, on research that they've done, data where, for example, other companies have come up with a different voluntary standard, and they'll present this to the SDO and request the SDO to request making a voluntary standard for that particular product.

And so the CPSC then works closely with consumer advocates, government entities, corporations, organizations, say, academia where someone has done a lot of research on a particular product. So all these people come together and they meet to -- to create this voluntary standard. So that is how the CPSC works with the voluntary standards organizations.

Q. How about on products that previously did not exist, Ms. Tenenbaum?

A. Well, products that previously did not exist, the CPSC still collects data. For example, they collect data called the N-E-I-S-S, the NEISS data, and those -- that data is generated from emergency departments throughout the country. The CPSC has saferproducts.gov which is a government website where people list their experiences with products. They -- they look at newspapers. They look at coroner's reports.

So they have ongoing data analysis of emerging hazards. So if something is an emerging hazard, they will go to the S -- the standards maker organization, say, "You need to create a new product for voluntary standard."

Then of course they can always recall a product if they think it's hazardous.

Q. When you first started working with the Consumer Product Safety Commission, were you familiar with the incline sleeper for children?

A. I was familiar with bassinets and cradles because that's one of the first rules that was taking -- taken up.

Q. Right.

A. And when I came to the CPSC, Congress had just passed the Consumer Product Safety

Improvement Act in 2008.

Q. Right.

A. And they passed that act in response to lead above the limits in the voluntary standard being found in a Mattel toy. So they started having hearings, and they also found that children's durable equipment had had a number of injuries and deaths, particularly cribs.

And so they passed the Danny Keysar Act named for a little boy whose parents I met several times, and requiring in section 104 of the CPSA that the ASTM write standards for all of these products, which the ASTM had bassinets and cradles. And then the CPSC was to adopt by reference the ASTM standards so that would be a mandatory rule.

And that is how early -- early when I got to the CPSC and met with the staff, I said, "We need to have a schedule where these mandatory rules" -- we were required to do two every six months, and the first rule that I really pushed was the crib rule, but bassinets and cradles was one of the first rules we took up as well.

Q. Would you agree with me if I said that the Danny Keysar Child Product Safety Notification

Act, in short, it says the -- I'm reading from it. I can show that to you.

Is that a copy of the act?

A. Yes, this is a copy of the act. That's part -- a part of the Consumer Product Safety Commission Act, and that is a copy of it.

Q. Right.

A. And so you'll see in there that the CPSC is to adopt the ASTM rule, or make it more stringent if they feel like the rule needs to be more stringent to protect the consumer and decrease the likelihood of injury.

Q. It says here in the short title, 1(B)(ii), it says, "In accordance with section 553 of title five of the United States code promulgate consumer product safety standards that are substantially the same as such voluntary standards," that would be one, and, two, "are more stringent than such voluntary standards if the Commission determines that more stringent standards would further reduce their risk of injury associated with that product."

Is that right?

A. That's a correct reading of the statute.

Q. Okay. And to look at if the standard needed to be more stringent, who would -- in a product such as a bassinet or a crib or the incline sleeper because it's a new product on the market, who would you turn to -- who would the CPSC turn to see if the standards were safe for children?

A. Well, the CPSC has its own laboratory where it tests products, and it looks -- so it -- we have -- the CPSC has professionals who have -- career professionals. They're not political appointees. They're engineers. They're experts in human factors. They're scientists.

And so CPSC can do its own testing. CPSC also works closely with other jurisdictions such as Canada, the EU, Australia, and any other jurisdiction that might regulate a product to look at its performance standards for that product.

So the CPSC also works closely with academics who have done research on particular -- in particular areas, works with other agencies such as the CDC and Health and Human Services. So there are a number of org -- and also the voluntary standards organizations --

Q. Okay.

A. -- to look at the product to determine how they can write a performance standard to make it safer.

Another thing the CPSC does is look at all the data, and they look at all the -- the deaths and all the injuries that have occurred with a certain product. They -- they interview the -- the injured person or that person's family, and they look at the product to determine was the -- was it something about the design of the product or how the product was used that could have made it safer.

So in this case the CPSC would have, you know -- they look at the voluntary standard. They look at all of the incidents of deaths and injuries. They determine how those injuries or deaths occurred, and then they determine whether or not it was the design flaw of the product.

Q. Do you have any personal knowledge -- you have any personal knowledge as to the manufacturer of this particular product other than through the CPSC?

A. No.

Q. In your report it says that -- I believe I read where you worked closely with CPSC

career employees who coordinated with the ASTM to develop mandatory rules -- this is in paragraph B of the first page under "Statement of Qualifications" --

A. Right.

Q. -- "to develop mandatory rules for infant and toddler products."

Do you see that?

A. Yes.

Q. I guess what I'm trying to establish is that you as the chairman can tell us all the different functions of the Consumer Product Safety Commission, how those organizations work with one another, testing, manufacture, what they look at in order to -- for the lack of a better word, be approved by the CPSC.

It's more of a you're here to testify as to what -- the function of the Consumer Product Safety Commission; you don't have any personal knowledge as to the incline sleeper itself, do you?

A. I'm not an expert on the incline sleeper. However, in your pleadings you said that the CPSC should have recalled this product, and you've also said that the product is a dangerous

product.

Q. Yes.

A. And I am here to talk about how the CPSC goes about rulemaking, how they look at the injuries and the deaths and determine whether it is a design flaw. And so I am here to talk about why the CPSC didn't recall the product, that the product did comply with the voluntary standards and mandatory rule at the time. It was tested and certified before it came into the country.

Q. We're --

A. So that -- that is what I'm here to say.

Q. Okay. The --

A. And when I talk about work closely with the CPSC career employees, typically the CPSC employees would come forward and have a briefing package on every rule which, you know, is part of what -- what we produced, and in that briefing package, they would have gone over every death and every incidence to explain how it happened.

They would -- then they would have a public meeting which was videotaped and which is online for bassinets and cradles explaining the rule and explaining, you know, how the product

is -- is compliant. And then it would go out for public comment. It would have to come back, and the CPSC, they would have to answer every public comment that was made on the proposed rule.

And so I know the process of how products are carefully vetted. They -- they are -- you know, the public comments are available for rules, and so I know the process of the CPSC, what they go through to certify that a rule -- that the product is safe.

Q. Yeah, sure.

MR. MOORE: Can we take a short break?

MR. HINES: Sure. It will give me an opportunity to get more coffee.

THE VIDEOGRAPHER: We're off the record at 10:50.

(A recess transpired.)

THE VIDEOGRAPHER: We're on the record at 10:58.

BY MR. MOORE:

Q. We're back on the record, Ms. Tenenbaum. I'm going to show you, and if you will look at this and identify it, please, as Plaintiff's Exhibit 2, which I believe is your report --

A. Yes.
Q. -- that you have provided to us.
A. That's right.
Q. If you'll identify that.
A. This is my report, Plaintiff's Exhibit 2.
Q. And that is your expert witness report, as well as your -- a brief CV --
A. A brief CV.
Q. -- of your accomplishments and what you get paid as well as other litigation that you have been involved in --
A. As an expert witness, yes.
Q. -- as an expert witness.
And you have also included the Consumer Product Safety Commission accomplishments from 2009 through 2012.
A. That's correct.
Q. Going back to your report, I understand that the Consumer Product Safety Commission would look at certain rates of injury, death that a product may -- that may occur because of that product or the manufacture of that product or the design of that product, but what I'm talking about is a new product, a product that

hasn't been on the market before.

The incline sleeper by Fisher-Price had not been marketed as early as 2009.

MR. HINES: Say that again.

BY MR. MOORE:

Q. Had not been marketed --

MR. HINES: Let me just -- it began to be marketed in 2009.

MR. MOORE: Right. Yes.

BY MR. MOORE:

Q. It began to be marketed in 2009 when you became the chairman of the CPSC.

A. It had been designed before that, and there was a voluntary standard ASTM F2194 that covered bassinets and cradles, and this particular product was considered a part of that rule by the CPSC.

So it was tested and certified, the design of it by 2194-07, and when it came on the market, it was tested under 2194-10. 2194-10. And this is in the report. And also before it was imported into the United States for sale, it was tested by Bureau Veritas, and it had a consumer -- a child's product certificate along with it saying that it complied with the ASTM standard 2194-10.

Now, in 2012 the CPSC took up the bassinet and cradle standard, and the staff then came to -- you know, the staff decided with -- based on public comment when it went out -- bassinet and cradle rule went out, the manufacturers of incline sleep products decided that they should have a -- you know, they requested the CPSC to have a separate rule. And so the CPSC created a separate rule on incline seat products, but it was always covered under the bassinet and cradle.

And I think I -- let me go back. It was tested and certified Bureau Veritas under ASTM 2194-7, and there's a certificate that said it met the requirements of the bassinet and cradle rule.

Q. And the requirements were -- is that the bassinet and the cradles -- that there could not be more than a five degree in the mattress or in the -- in the mattress to those products, right?

A. Well, you're conflating the mattress and a bassinet which were foldable --

Q. Right.

A. -- and to -- the incline -- and they're two -- it's apples and oranges. When you

have -- the -- the bassinets were flat or nearly flat, but they --

Q. Do you know why?

A. Because that was just the design of the product. If you look at cradles, they've been made for centuries with rockers, the cradles, and that was just the -- the rule.

And incline sleep products were covered under that rule originally, and then when they came forward with CPSC to have a new rule -- ASTM new rule for bassinets and cradles, they -- they decided that it would be -- the definition would be flat or nearly flat. That was because -- and then the people who made incline sleep products, for example, the hammocks, said, "Well, you know, we don't fit the definition, so we need another rule."

And you can find that on -- on the CPSC website. There's a hearing on the bassinet and cradle rule and -- in which Patty Edwards explained.

They also com -- explained the mattress -- and these were not -- some mattresses are one piece, but the mattress you're talking about was foldable, and so they -- they said, "If

you have a mattress that's foldable, you have to test it with a -- not a CAMI doll but a cylinder that weighs 17.5 pounds.

And you put it in that -- that crease, and you also take an incline -- inclometer [sic], incline meter, inclometer, and you put it alongside that, and if it's over five -- or ten degrees, then it doesn't pass the test.

So what that was -- what mattresses were -- and it's -- Patty Edwards explains this on the video before the PS -- CPSC. She says for children who get prone in those creases, it creates a suffocation hazard, but it was talking about children who are face down on those foldable mattresses, and if the -- the fold was over ten degrees, then it didn't pass the test.

So that was really just for that foldable mattress for bassinets. So mattresses have one -- had mattresses with no folds. But this was for portable bassinets that had a foldable mattress. That's what that test is about.

Q. All right. And you said testing and certification by --

A. Bureau Veritas.

Q. Yes.
And who are they?
A. Bureau Veritas is one of the many testing companies in the world. They test products all over the world. They have laboratories all over the world, but you'll have Bureau Veritas, SGS, Intertek, UL. All of them are testing laboratories that can certify if a product meets the standard.
Q. Does --
A. Some are mandatory. Some are voluntary.
Q. Does Bureau Veritas have any affiliation with Mattel?
A. No, it's an independent laboratory.
Q. It's an independent third party?
A. (Nods head.)
Q. Well, you do know that this product, this newborn Rock 'n Play Sleeper is not sold and it will not be sold in Canada. You know that?
A. Canada and the United States work very closely, but they don't have the same standards sometimes.
Q. And this product is not and will not be sold in the U.K., correct?

A. I'm not aware of that.
Q. Okay. Are you aware of the standard set by the -- have you read any articles by the Midwives Association in the U.K.?
A. No, I have not.
Q. Is that something that the CPSC would look at internationally to see what other standards are in other countries?
A. CPSC does look at other standards in other countries, and sometimes the CPSC has a stronger standard than other countries. In fact, the U.K. doesn't require testing and certification, nor does Canada of their children's products. And in the United States you have to have it -- you have to have the product tested, certified. You have to have the certificate. Canada does not require that nor does the U.K.
Q. Who would I contact at the CPSC to sit down with me and tell me everything that they looked at and went over in order to determine whether or not this particular product was fit for its intended use as a sleeper?
A. You can look under the briefing -- the notice of proposed rulemaking. The CPSC puts out all the data, the number of incidents, deaths --

Q. Who is it I talk to?
A. Celestine Kish. Her address is right there at the bottom of the --
Q. I'm sorry?
A. Celestine Kish, K-I-S-H. And if you look at the bottom of the proposed rule, it will have her telephone number, as well as her e-mail address.
Q. Okay.
A. It's ckish@cpsc.gov.
Q. You have also stated that they -- they would have read articles certainly by the Journal of Pediatrics, correct, in -- in --
A. Yes, they worked very closely with the American Academy of Pediatrics in rulemaking.
Q. Okay. Well --
A. Ami Kadia is a regular feature. That's the woman's name with the AAP.
Q. And you do know that the American Academy of Pediatrics said that a child should not be in a sleeper that is more than elevated five degrees, correct?
A. No.
MR. HINES: Object to form. Foundation.

BY MR. MOORE:
Q. That's all right. You can answer it.
A. The American Academy of Pedi -- Pediatrics works closely with the CPSC. I had a lot of involvement with that organization when I was at the CPSC. And because we worked together on the Back to Sleep initiative educating parents that all -- that the best place for a child to routinely sleep was in a crib. So the word is routinely.
And the American Academy of Pediatrics has been very outspoken as advocates that the cribs -- the child should be placed on its back to sleep, that the -- the mattress should be firm. There should be nothing else in the crib besides the baby, no comforters, no pillows, no toys, and that to avoid hydrocephaly that the child should have a routine tummy time that's supervised by the parents or caregivers.
So the CPSC has worked closely with the AAP on the Back to Sleep initiative to say that -- to -- to give educational advice to parents on the cribs and how babies should routinely sleep. But the AAP has not come out against the incline sleepers.

Q. Okay. So --

A. They have come out against baby bumpers. They warn parents not to use it. The AAP has never said not to use an incline sleeper. But they have advised that if a child falls asleep in some other products other than a crib, the child should be removed from that product as soon as they fall asleep and put into a crib on their back.

Q. So you would agree with me that if they advertise this as an all night sleeper, that would be incorrect --

MR. HINES: Object to form.

BY MR. MOORE:

Q. -- for them to do that?

MR. HINES: I don't know what you mean by "incorrect."

BY MR. MOORE:

Q. All right. If they advertise this product as an all night sleeper, that would be inconsistent with the use of the product, correct?

A. It would be in --

MR. HINES: Object to form.

THE WITNESS: Well --

MR. MOORE: That's all right. You can

answer.
THE WITNESS: The AAP has -- as well as the CPSC in the Back to Sleep campaign has advised parents that the child should be placed in a crib for routine sleeping. Routine, but there are a number of products where there's an incline. There are a number of products that, you know, are sold and the CPSC has not recalled them or said they're dangerous.
But for routine sleeping I think everyone agrees that the child should be in a crib with a firm mattress on its back for routine sleeping. But there are other places where children fall asleep.
BY MR. MOORE:
Q. In a supine position looking up?
A. In a supine position. Strollers, car seats --
Q. So you would --
A. -- stationary seats.
Q. I'm sorry.
A. No one has -- I don't know that anyone has said that the child has to be contained in a crib a hundred percent of the time. The number of

places -- you hold your baby in your arms inclined.

Q. Right.

What I'm talking about is the newborn Rock 'n Play Sleeper. And it is the plaintiffs' position that the position of the incline being 30 degrees is too much of a degree and that for a child to sleep, the child should be in a -- on a horizontal surface in the supine position which is consistent with the American Academy of Pediatrics.

A. It's consistent with the American Academy of Pediatrics' definition of sleeping in a crib, but the CPSC has looked at this product.

Q. Who?

A. The CPSC has come out with a rule for incline sleepers. There are at least five different kinds, if you'll read the notice of proposed rulemaking, where they have identified five different kinds of incline sleepers --

Q. Uh-huh.

A. -- in the notice of proposed rulemaking. The Rock 'n Play is only one which is -- which is incline sleeper on a frame.

The CPSC is developing a new rule just

particularly for incline sleepers. And it's ASTM 3118, and there are two different versions, 15 and 17. It's out for public comment one more time. The ASTM now is taking a final vote.

The CPSC does not consider this product dangerous, and it -- it believes that it is congruent with the AAP's recommendation that for routine sleep a child should be in a crib. However, it is writing a rule for five different kinds of incline sleepers. It has not recalled this product. It doesn't intend to recall this product, and it is working on a mandatory rule for this product where it recognizes that the child can be in an incline sleeper.

Q. Does the CPSC recommend that the incline sleeper be used for sleeping?

A. The CPSC calls them incline -- infant incline sleep products. That's the name of the rule. And in the notice of proposed rulemaking, it goes to the different types of incline sleep products. It goes through and discusses all the incidents of injuries and deaths and has come out with this rule that said, "We do not think after looking at all these injuries and deaths that the design of the product contributed to the deaths of

the children."

And they recognize that there have been 14 deaths, and they talk to you individually on every -- the -- the NPR describes every death, and it goes through the facts of every death and has recommended this new rule 3118-17, and it will become a mandatory rule that these products by -- in this year, 2018.

Q. So how much weight does the CPSC give, let's just say, the American Academy of Pediatrics and their advice? How much weight does that lend --

A. They respect the American Academy of Pediatrics. They don't go along with them every single time, but they do respect them. And they respect their advocacy. In fact, they believe that they have a common mission, both the CPSC and the American Academy of Pediatrics, to avoid injuries and save lives of children.

And in rulemaking, I think the CPSC is unique in that once it places a notice of proposed rulemaking out to the public, anyone can contribute. So the AARP -- AAP, any other organization may offer written comments and also ask for meetings with the -- I met with the AAP

several times to express their concerns.

And then the CPSC has to in writing and publish this in the Federal Register answer everyone's concern with a particular product. So it's right there what they said, how the CPSC answered it in the Federal Register.

Q. Do -- do you know what the current rule is in the Federal Register with respect to incline sleepers and the degree that the -- and the incline degree?

A. It can be from ten degrees to 30 degrees horizontal.

Q. And horizontal meaning that the -- from shoulders to the head and go up to 30 degrees?

A. It can go up to 30 degrees.

Q. All right. Do you know whether or not that is inconsistent with the position of the American Academy of Pediatrics?

A. It is not when you're talking about routine sleep. The American Academy of Pediatrics believes that a child when it's put to sleep should be supine on a flat surface in a crib. But the American Academy of Pediatrics in my research has never said a child can't be elevated, period,

and they just advise that if a child is in any elevated product that the child be removed as soon as it falls asleep and put in a crib supine for the rest of that sleep. And that is in all the articles I have read from the AARP -- I mean, the AAP.

So it's not inconsistent with the fact that they recognize -- and I've read the articles that we've provided for you -- that if a child falls asleep in an elevated incline sleep positioner -- a sleeper, it needs to be removed after -- the child needs to be removed from the product and placed supine in a crib.

Q. Okay. So, again, I would ask you if Fisher-Price advertises the newborn sleeper to be a product where you sleep all night, that would be inconsistent both with the recommendations of the CPSC and the AAP?

A. The CPSC has not -- I don't think they opined on whether it can be all night. So I'm -- I don't know -- I've not seen any advertisements from Fisher-Price.

Q. All right. But if the advertisements are that this is a sleep all night product, that would be inconsistent with what it was designed

for from the standpoint of the CPSC testing, correct?

A. No, the CPSC does not test on whether a -- how many hours the child spends in the -- in a -- in a product. The CPSC has a list -- and we've provided you the Bureau Veritas, as well as SGS, all the laboratory tests. It goes down and looks at all the performance criteria for the product and, you know, certifies that all of them have been met.

Q. Well, it certainly would be inconsistent with the recommendations of the AAP?

A. The AAP has as its primary goal for student -- for -- for babies to be in a crib for their routine sleep. And that's the word they use, routine sleep. And they acknowledge that there are other places where you find children all during the day that have inclined -- they're inclined, and so their recommendation is to take the child out of those products when they fall asleep and put them in the bed --

Q. Does the --

A. -- in the crib.

Q. -- CPSC do -- have any independent testing on positional asphyxia?

A. The CPSC would look -- there are so many articles and research on positional asphyxia, but if you look at the notice of proposed rulemaking on the incline sleepers, this is not something that the CPSC has -- they looked at all the deaths and injuries. They don't think that their product contributes to that.

Q. And who makes that determination at the CPSC?

A. There's a whole host of people who work on this rule, plus it goes out for public comment. They are worried that people will substitute a mattress or a pad or put soft bedding which can contribute to asphyxia.

They also realize that children are left beyond the age limitation which is when they can turn over by themselves, and several of the deaths have resulted in the child turning over into a prone position. They have recalled products that were inclined, like the Nap Nanny where the child could turn over in the Nap Nanny and then asphyxiate in the soft bedding. It was too soft.

So the CPSC has -- has very much looked at all of these products, and soft bedding,

soft mattresses have been issues in which the children have been injured or have been killed because of those issues.

But they have looked at all the -- the data of injuries, deaths. They've looked at the performance standards, and the CPSC is now coming out with a rule that would allow the product to go up to 30 degrees.

Q. Now, again, you're testifying as to what the agency does in order to gather the information and -- and come out with rulings. You don't have any personal knowledge of the testing of this product or anything of that nature?

A. As chairman of the CPSC, I met regularly with the staff when they -- and they would have briefings and they would come in my office and we would talk about the rules. We would go over all the data. We would discuss the briefing packages which we provided for you --

Q. Uh-huh.

A. -- which are online for the -- for products.

So I would meet with the staff, talk about, you know, what the -- the comments the people have made to the rule, talk about the data,

talk about the design, talking about the testing and certification, and so that's my personal knowledge.

Q. Well, does the CPSC acknowledge that a child postterm can positionally asphyxiate in this product?

A. They have looked at all the deaths and looked at the reasons why, and most have been -- one, they didn't use the restraint, or, two, the child was able to turn over with the restraint, or there was soft bedding. They even had cases where people take the incline sleeper and put it in the crib and the child has turned over into the soft bedding of the crib.

So they look at all the injuries and deaths, and they look at all the comments from AAP, from Kids in Danger, from Consumers Union, all the people who regularly look at these rules and comments.

Q. Well, does the CPSC acknowledge that it is possible for a baby postterm 40 weeks gestation to positionally asphyxiate?

A. They have looked at positional asphyxiation data and studies, and they would not be coming out with this rule if they thought that

30 degree -- a child sitting in the product by itself at the age recommended could just automatically positionally asphyxiate at 30 degrees.

Q. Did --

A. I would not be supporting the rule if they were -- if they did.

Q. You gave a list of things in your report, items that you read in preparation. Did you read the deposition of Dr. Roy Benaroch?

A. I did.

Q. Okay.

A. I read your other -- your engineer too, Gaudreau.

Q. Yeah, yeah. Mr. Gaudreau.

A. Who might -- said, "I don't keep up with what is going on at the CPSC."

I mean, he was an engineer that was commenting on this product and did not even know that the CPSC had a rule on this product.

Q. All right.

A. That was -- that was -- that worried...

Q. So what are you saying?

A. I'm saying that he did not -- not

follow how this product was regulated and tested and was an expert on the product when he didn't even know what the CPSC was doing with the product.

Q. Okay. All right. Let me ask you this. Did you read the deposition of Roy Benaroch, the pediatrician?

A. I did.

Q. And did you read where it's Dr. Benaroch's position in this case that this child was injured from positional asphyxia and not from the reflux? Did you read that?

A. I did.

Q. Did you read where it is his position that to incline a horizontal surface for sleeping is dangerous to a child?

A. I did read that.

Q. Okay. Was -- in your meetings that you held with this product at the CPSC, was that ever discussed or the -- or the -- the American Academy of Pediatrics, do you recall whether or not they were questioned about this product and their position?

A. The CP -- or the AAP has -- follows all of these rules very carefully and closely, and

they would -- they give their opinions to the CPSC on a regular basis.

Q. Did they give their opinion on this position, the 30 degree angle?

A. They have given their position on ASTM F3118-17.

Q. Did -- what was that opinion?

A. That they believed that routinely a child should be in a crib, and if a child does fall asleep in an incline sleep position, the child should be -- well, they didn't -- they have not commented directly on this product.

They have commented on other incline products that are out on the market, but not this product which is the 30 degrees. They've commented on other products, and they said the child should be removed and placed in the bed once they fall asleep.

Q. They've also found that the products -- that the Fisher-Price product, the newborn Rock 'n Play Sleeper, the child should not sleep in that -- in that particular product, and that was their recommendation?

A. They used the word routinely.

Q. I'm sorry?

A. Routinely.
Q. All right.
A. They -- they -- the word routine -- a child should not routinely sleep, and they said in any incline product --
Q. Uh-huh.
A. -- routinely. And when the child falls asleep, they should be placed into the crib afterwards.
MR. HINES: Let me just object -- go back and object to the form of the question.
Can we take a short break.
THE WITNESS: Okay.
THE VIDEOGRAPHER: We're off the record at 11:29.
(A recess transpired.)
THE VIDEOGRAPHER: We're on the record at 11:36.
MR. MOORE: This deposition is concluded. Thank you very much.
THE WITNESS: Well, thank you very much.
MR. HINES: We're done.
THE VIDEOGRAPHER: We're off the

record at 11:37.

(The deposition was concluded at 11:37 p.m.)

SIGNATURE OF DEPONENT

I, the undersigned, INEZ M. TENENBAUM, do hereby certify that I have read the foregoing deposition and find it to be a true and accurate transcription of my testimony, with the following corrections, if any:

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| ---- | ---- | ----------------- | ------------- |
| ---- | ---- | ----------------- | ------------- |
| ---- | ---- | ----------------- | ------------- |
| ---- | ---- | ----------------- | ------------- |
| ---- | ---- | ----------------- | ------------- |
| ---- | ---- | ----------------- | ------------- |
| ---- | ---- | ----------------- | ------------- |
| ---- | ---- | ----------------- | ------------- |
| ---- | ---- | ----------------- | ------------- |
| ---- | ---- | ----------------- | ------------- |
| ---- | ---- | ----------------- | ------------- |
| ---- | ---- | ----------------- | ------------- |
| ---- | ---- | ----------------- | ------------- |
| ---- | ---- | ----------------- | ------------- |

-------------------------

INEZ M. TENENBAUM Date

CERTIFICATE OF REPORTER

I, Yvonne R. Thurston-Bohannon, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public for the State of South Carolina at Large, do hereby certify:

That the foregoing transcript was taken before me on the date and at the time and location stated on page 1 of this transcript; that the deponent was duly sworn to testify to the truth, the whole truth and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed; that the foregoing deposition as typed is a true, accurate and complete record of the testimony of the deponent and of all objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal March 12, 2018, at Columbia, Richland County, South Carolina.

-------------------------
Yvonne R. Thurston-Bohannon
Registered Merit
Reporter, CRR
My Commission expires
May 6, 2025

**Exhibits**

**TannenbaumI 1** 4:5 15:11

**TannenbaumI 2** 4:9 31:24 32:6

**1**

**1** 4:5 15:11

**1(b)(ii)** 26:14

**104** 25:11

**10:15** 4:13

**10:50** 31:16

**10:58** 31:19

**11:29** 55:16

**11:36** 55:19

**11:37** 56:1,3

**1320** 4:24

**14** 45:3

**15** 4:9 44:2

**17** 44:3

**17.5** 36:3

**18** 9:22

**1974** 17:3

**1986** 11:16

**1991** 13:2,3

**1994** 14:13, 14

**1998** 13:4, 25

**2**

**2** 4:9 31:24 32:6

**2002** 13:16 14:4,5

**2007** 14:6, 7,11,18

**2008** 25:1

**2009** 14:23, 24 32:17 33:3,8,11

**2012** 32:17 34:1

**2013** 17:9, 24

**2015** 17:10, 14,24

**2017** 4:10

**2018** 4:14 45:8

**2194-07** 33:19

**2194-10** 33:20,25

**2194-7** 34:14

**28th** 4:13

**29201** 9:15

**3**

**30** 43:6 46:11,14, 16 50:8 52:1,3 54:4,15

**3118** 44:2

**3118-17** 45:6

**4**

**40** 51:21

**5**

**553** 26:14

**7**

**70** 17:2

**74** 17:1,4

**8**

**801** 9:14

**83** 16:23

**86** 16:24

**9**

**91** 13:5,6, 18

**94** 13:7

**98** 13:9 14:4

**A**

**AAP** 39:18 40:21,24 41:4 42:2 45:23,25 47:6,18 48:12,13 51:17 53:24

**AAP'S** 44:7

**AARP** 45:23 47:5

**academia** 23:18

**academics** 27:20

**Academy** 39:15,20 40:3,11 43:10,13 45:10,13, 18 46:19, 21,24 53:21

**accomplishments** 32:10,16

**accordance** 26:14

**acknowledge** 48:16 51:4,20

**act** 25:1,3, 10 26:1,3,

4,6

**address** 9:13 39:2,8

**administrative** 12:7,14

**adopt** 25:14 26:9

**advertise** 41:11,19

**advertisements** 47:21,23

**advertises** 47:15

**advice** 40:22 45:11

**advise** 47:1

**advised** 16:9 41:5 42:4

**advocacy** 45:16

**advocates** 23:17 40:12

**affiliation** 37:14

**age** 9:22 49:16 52:2

**agencies** 27:21

**agency** 50:10

**agree** 25:24 41:10

**agrees** 42:12

**allowed** 6:11

**alongside** 36:7

**Alpharetta** 10:3,4

**American** 39:15,19 40:3,11 43:10,12 45:10,13, 18 46:19, 21,24 53:20

**Ami** 39:17

**analysis** 24:10

**Andre** 10:18

**Andrew** 10:10

**angle** 54:4

**annual** 23:6

**annually** 23:5

**ANSI** 22:23

**apples** 34:25

**appointed** 12:10 14:24 15:5

**appointees** 27:12

**approved** 29:16

**approximately** 13:1

**area** 8:23 12:5

**areas** 27:21

**arms** 43:1

**articles** 38:3 39:12 47:5,8 49:2

**Asher** 4:19 5:9 6:3,5, 6

**asleep** 41:5, 8 42:15 47:3,10 48:21 54:10,18 55:8

**asphyxia** 48:25 49:2,14 53:11

**asphyxiate** 49:22 51:5,22 52:3

**asphyxiation** 51:24

**associate** 11:21 12:4,5 16:2

**Association** 38:4

**assume** 7:17

**AST** 19:20

**ASTM** 22:23 25:12,13, 15 26:9 29:1 33:14,25 34:13 35:11 44:1,4 54:5

**Atlanta** 4:23 9:25 10:14

**attorneys** 20:12

**Australia** 27:16

**automatically** 52:3

**avoid** 40:17 45:18

**aware** 38:1,2

**B**

**babies** 40:23 48:14

**baby** 40:16 41:2 43:1 51:21

**back** 7:25 13:8 17:17,18

18:6 31:2, 21 32:19 34:12 40:7,13,21 41:9 42:3, 13 55:11

**background** 9:3

**Barack** 15:1

**based** 34:4

**basis** 54:2

**bassinet** 27:3 34:2, 5,11,15, 17,22 35:19

**bassinets** 18:23 24:20 25:13,22 30:24 33:15 35:1,11 36:18,20

**bed** 48:21 54:17

**bedding** 49:13,22, 25 51:11, 14

**began** 33:7, 11

**behalf** 5:12

**believed** 54:8

**believes** 44:6 46:22

**Benaroch** 52:10 53:7

**Benaroch's** 53:10

**Bohannon** 5:2

**bottom** 39:3, 6

**bought** 15:21

**boy** 25:10

**Boyd** 11:21 12:1 13:6, 18

**break** 8:8 22:11 31:12 55:13

**briefing** 30:17,19 38:23 50:19

**briefings** 50:16

**bring** 15:19

**brought** 15:23

**bumpers** 41:3

**Bureau** 33:23 34:13 36:25 37:3,7,13 48:6

**C**

**called** 20:9, 11 23:9 24:3

**calls** 44:17

**CAMI** 36:2

**campaign** 42:3

**Canada** 27:16 37:20,21 38:13,17

**capacity** 7:5,8,9

**car** 18:16 42:18

**career** 27:11 29:1 30:16

**carefully** 31:6 53:25

**caregivers** 40:19

**Carolina** 4:25 9:15 11:4,14,24 12:21 13:23

**case** 12:11, 23 19:11 20:12,13, 19 21:11, 23,24 22:1 28:13 53:10

**cases** 21:4 51:11

**CDC** 27:22

**Celestine** 39:2,5

**Center** 12:21 13:23

**centuries** 35:6

**certificate** 33:24 34:14 38:16

**certification** 19:7 36:24 38:13 51:2

**certified** 30:10 33:18 34:13 38:16

**certifies** 48:9

**certify** 31:9 37:8

**chairman** 15:5 29:11 33:12 50:14

**child** 6:6 20:20 25:25

39:20 40:8,13,17 41:5,7 42:4,12,24 43:8 44:8, 13 46:22, 25 47:1,2, 9,12 48:4, 20 49:18, 21 51:5, 10,13 52:1 53:11,16 54:9,11, 17,21 55:4,7

**child's** 33:24

**children** 9:21 24:19 27:7 36:12,14 42:15 45:1,19 48:17 49:15 50:2

**children's** 19:8 25:7 38:13

**Chinese** 21:3

**ckish@cpsc.gov.** 39:10

**clarification** 8:22

**clarify** 21:6

**clerk** 11:19

**closely** 23:16 27:15,19 28:25 30:15 37:22 39:14 40:4,20 53:25

**cocounsel** 5:10

**code** 26:15

**coffee** 31:14

**collect** 24:3

**collects** 24:2

**Columbia** 4:25 9:15 11:24 17:17,18, 19 18:8

**comforters** 40:16

**comment** 31:2,4 34:4 44:3 49:12

**commented** 54:12,13, 16

**commenting** 52:19

**comments** 31:7 45:24

50:24 51:16,19

**commission** 14:25 15:4,6,8 17:16 18:15 19:17 21:3 22:16 24:18 26:6,20 29:13,19 32:16,21

**common** 45:17

**commuted** 17:19

**companies** 16:9 20:10,11 23:11 37:4

**compensated** 22:5

**compliant** 31:1

**complied** 33:25

**comply** 30:8

**concern** 46:4

**concerns** 46:1

**concluded** 55:21 56:2

**conflating** 34:21

**Congress** 24:24

**congruent** 44:7

**consensus** 19:19 22:17

**considered** 16:16 33:16

**consistent** 43:10,12

**consultant** 14:19,22

**consumer** 14:25 15:4,5 17:16 18:14 19:17,20 21:2 22:15,17 23:17 24:18,25 26:5,11,16 29:12,18 32:16,20 33:23

**Consumers** 51:17

**contact** 38:18

**contained** 42:24

**contaminated** 21:7

**contribute** 45:23 49:14

**contributed** 44:25

**contributes** 49:7

**Control** 16:8,18

**coordinated** 29:1

**copy** 15:12 26:3,4,6

**coroner's** 24:9

**corporations** 23:18

**correct** 11:17 26:24 32:18 37:25 39:13,22 41:21 48:2

**counsel** 4:2 5:4 18:2

**countries** 38:8,10,11

**country** 24:5 30:10

**couple** 21:21

**court** 4:22 5:1,13 6:20 12:10,23 20:15,16

**Courtney** 4:17 5:7 6:3

**covered** 19:12 22:25 33:15 34:10 35:9

**CP** 53:24

**CPSA** 25:12

**CPSC** 17:6 19:18,22, 24 20:2,3, 10 21:6 23:2,8,16, 22 24:2,6, 24 25:14, 18 26:9 27:6,8,10, 14,15,19 28:4,13, 22,25 29:16,24 30:4,7,16 31:3,8 33:12,17 34:1,8,9 35:10,19 36:11 38:6,9,10, 18,24 40:4,6,20 42:3,9 43:14,16, 25 44:5, 15,17 45:9,17,20 46:2,5 47:18,19 48:1,3,5, 24 49:1,5, 9,24 50:6, 14 51:4,20 52:17,20 53:3,19 54:1

**CPSC'S** 23:5

**cradle** 34:2, 5,11,15 35:20

**cradles** 18:23 24:21 25:14,22 30:24 33:15 34:17 35:5,6,11

**crease** 36:4

**creases** 36:12

**create** 23:21 24:13

**created** 34:9

**creates** 36:13

**crib** 18:24 25:22 27:3 40:9,15 41:6,8 42:5,13,25 43:14 44:8 46:23 47:3,13 48:14,23 51:13,14 54:9 55:8

**cribs** 18:16 25:8 40:13,23

**criteria** 48:8

**CSA** 22:23

**Cumming** 10:5,6

**current** 17:5 18:4,5 46:7

**CV** 32:8,9

**cylinder** 36:2

**D**

**Danger** 51:17

**dangerous** 29:25 42:10 44:6 53:16

**Danny** 25:9, 25

**data** 23:9, 10 24:2,3, 4,10 28:5 38:25 50:5,18,25 51:24

**date** 4:13

**daughter** 10:23

**David** 4:17 5:7 6:2

**day** 48:18

**deals** 20:23

**dealt** 20:20

**death** 30:20 32:22 45:4,5

**deaths** 23:10 25:8 28:6, 15,17 30:5 38:25 44:22,24, 25 45:3 49:6,18 50:5 51:7, 16

**December** 4:9

**decided** 34:3,6 35:12

**decrease** 26:12

**defendant** 4:21 5:12 7:15 19:11 21:9,10, 16,18

**definition** 35:12,16 43:13

**degree** 11:10,11, 13 16:25 18:13 34:18 43:7 46:9,10 52:1 54:4

**degrees** 36:8,16 39:22 43:7 46:11,12, 15,16 50:8 52:4 54:15

**Department** 12:9,22 16:7,17

**departments** 24:5

**deponent** 4:2

**deposition** 4:3,6,16, 24 6:7,10, 14,20 7:1 8:2 21:22 52:10 53:6 55:20 56:2

**depositions** 6:10

**describes** 45:4

**design** 28:10,18 30:6 32:24 33:19 35:4 44:25 51:1

**designated** 7:14 8:23

**designed** 33:13 47:25

**determination** 49:8

**determine** 19:23 28:1,9,16, 17 30:5 38:20

**determines** 26:20

**develop** 19:19 29:2,6

**developed** 22:16 23:3

**developing** 43:25

**development** 23:8

**directly** 54:12

**discuss** 19:15 50:18

**discussed** 53:20

**discusses** 44:21

**district** 4:21,22 10:1

**Division** 4:23

**documents** 15:19

**doll** 36:2

**dollars** 22:6

**Donald** 5:1

**double** 9:11

**drywall** 21:3

**duly** 5:17

**durable** 25:7

**E**

**e-mail** 39:7

**early** 25:17 33:3

**educating** 40:7

**education** 11:11,12 13:4,10, 12,17 14:1,19,22 16:20 18:10,12

**educational** 9:2 40:22

**Edwards** 35:20 36:10

**election** 13:13

**electronically** 15:17

**elementary** 11:11

**elevated** 39:21 46:25 47:2,10

**emergency** 24:5

**emerging** 24:11

**employees** 29:1 30:16,17

**employment** 9:3

**engaged** 15:7

**engineer** 52:13,18

**engineers** 27:12

**entities** 16:4 23:17

**environmental** 16:5,8,17

**equipment** 25:7

**establish** 29:10

**EU** 27:16

**everyone's** 46:4

**Evidence** 6:12

**EXAMINATION** 5:21

**examined** 5:17

**Exhibit** 4:5, 9 15:11 31:24 32:6

**exist** 23:25 24:2

**exists** 19:23

**experience** 15:3 16:15 18:15 19:2

**experiences** 24:7

**expert** 4:10 7:5,14 8:23 15:21 20:14,17, 19 21:5 29:22 32:7,13,14 53:2

**experts** 27:12

**explain** 30:21

**explained** 35:21,22

**explaining** 30:24,25

**explains** 36:10

**express** 46:1

**extensive** 16:14

**F**

**F2194** 33:14

**F3118-17** 54:6

**face** 36:14

**fact** 17:19 38:11 45:16 47:7

**factors** 27:13

**facts** 45:5

**fall** 41:8 42:15 48:20 54:10,18

**falls** 41:5 47:3,10 55:8

**familiar** 24:19,20

**family** 10:3 12:21 13:24 28:8

**feature** 39:17

**February** 4:13

**federal** 6:11 12:9,10,23 46:3,6,8

**feel** 26:10

**file** 15:23

**final** 44:4

**find** 35:18 48:17

**Finley** 11:22

**firm** 9:16, 17 11:20, 25 12:2,16 16:1 17:6, 11,14 18:7 21:14,17, 19 40:14 42:13

**firms** 18:13

**Fisher-price** 4:20 5:12 7:15 19:11 20:7 33:2 47:15,22 54:20

**fit** 35:16

38:21

**flat** 35:1, 2,13 46:23

**flaw** 28:18 30:6

**fold** 36:15

**foldable** 34:22 35:25 36:1,14, 18,21

**folds** 36:19

**follow** 53:1

**form** 6:15 39:24 41:13,23 55:11

**forward** 30:17 35:10

**found** 20:7 25:5,6 54:19

**Foundation** 39:25

**four-year** 14:2,3,4

**frame** 43:24

**friends** 4:18 5:8

**full** 9:7

**function** 29:18

**functions** 29:12

**G**

**gassing** 20:22

**gather** 7:13 50:10

**Gaudreau** 52:14,15

**gave** 21:21 52:8

**general** 9:1, 3

**generated** 24:4

**Georgia** 4:22 9:25 11:5, 6,8,10 16:25

**Georgia-pacific** 21:18

**Gervais** 9:14

**gestation** 51:22

**Gibson** 11:25

**Gina** 10:23

**give** 10:8 20:1 31:13 40:22 45:9 54:1,3

**glad** 7:20

**goal** 48:13

**Good** 5:24, 25

**Goodrich** 4:17,18,19 5:7,8,9

**government** 23:17 24:6

**governmental** 16:3

**governor** 13:7 14:11,12

**graduated** 11:6 16:24

**Graves** 5:1

**Greenville** 18:7

**grew** 11:5

**grow** 11:4

**guardian** 12:10

**guess** 29:10

**H**

**H-i-l-l** 10:11

**half** 17:22

**hammocks** 35:15

**happened** 30:21

**Hawkinsville** 11:6

**hazard** 19:23 24:12 36:13

**hazardous** 24:16

**hazards** 24:11

**head** 22:3 37:17 46:14

**Health** 16:7, 17 27:22

**hearing** 35:19

**hearings** 25:6

**held** 4:24 53:19

**high** 11:6

**Hill** 10:10, 11

**Hines** 5:11 6:18 8:1 15:16,23 31:13 33:4,7 39:24 41:13,16, 23 55:10, 24

**Hinson** 5:10 6:2

**histories** 16:11

**hold** 43:1

**home** 17:20

**homes** 21:7

**horizontal** 43:9 46:12,13 53:15

**host** 49:10

**hour** 22:6

**hourly** 22:5

**hours** 48:4

**house** 16:13 21:4

**human** 27:13, 22

**hundred** 42:25

**husband** 10:13 11:2

**husband's** 10:25 11:1

**Huseby** 5:3

**hydrocephaly** 40:17

**hydrogen** 20:22,25 21:7

**I**

**identification** 4:8,11

**identified** 43:19

**identify** 31:23 32:4

**imported** 33:22

**Improvement** 25:1

**incarcerated** 12:11

**incidence** 30:21

**incidents** 28:15 38:25 44:22

**incline** 19:2,21 24:19 27:4 29:20,22 33:2 34:6, 9,24 35:8, 14 36:5,6 40:25 41:4 42:7 43:6, 17,20,24 44:1,10, 14,16,17, 18,20 46:9,10 47:10 49:4 51:12 53:15 54:10,13 55:5

**inclined** 43:2 48:18,19 49:20

**inclometer** 36:5,6

**included** 32:15

**inconsistent** 41:21 46:18 47:7,17,25 48:12

**incorrect** 41:12,17

**independent** 37:15,16 48:24

**individually** 4:18 5:8 7:9 45:3

**industrial** 16:11

**Inez** 4:7, 10,16 5:16 9:9 17:12 20:8

**infant** 19:2, 5,21 29:7 44:17

**information** 7:13 8:21 9:1 50:11

**initiative** 40:7,21

**injured** 28:8 50:2 53:11

**injuries** 23:9 25:8 28:6,16 30:5 44:22,24 45:19 49:6 50:5 51:15

**injury** 26:12,22 32:21

**intend** 44:11

**intended** 38:22

**interest** 12:8,13

**internationall y** 38:7

**Intertek** 37:7

**interview** 28:7

**introduce** 5:4

**invited** 18:1

**involved** 12:22

20:19,25 32:12

**involvement** 40:5

**involving** 20:12

**issue** 19:24

**issues** 50:1, 3

**items** 52:9

**J**

**Jan** 5:10 6:2

**January** 14:6

**join** 18:1

**joined** 17:8, 10,13,23

**Journal** 39:12

**judge** 12:10

**juries** 9:4

**jurisdiction** 27:17

**jurisdictions** 27:15

**justice** 12:23,25

**juvenile** 12:23,25

**K**

**K-e-s-s-l-e-r** 10:19,21

**K-i-s-h** 39:5

**Kadia** 39:17

**Kessler** 10:18,19, 23

**Kevin** 5:6 6:1 7:18

**Keysar** 25:9, 25

**Kids** 51:17

**killed** 50:2

**kind** 8:13

**kinds** 43:18, 20 44:10

**Kish** 39:2,5

**Knolton** 11:21

**knowledge** 18:23 19:1 28:19,20 29:20 50:12 51:3

**L**

**laboratories** 37:6,8

**laboratory** 27:8 37:15 48:7

**lack** 29:15

**landfill** 21:1

**law** 9:16,17 11:13,19 12:2,6,7, 8,13,14 14:20 16:1,5,12, 20,23 17:6,11 18:12,13 21:14,17, 19

**Lawrence** 10:19

**lead** 16:15 25:4

**left** 13:5, 18 17:9, 10,24 20:10 49:16

**lend** 45:12

**liability** 16:10

**lieutenant** 13:7 14:11,12

**likelihood** 26:12

**limitation** 49:16

**limits** 25:4

**Lindsay** 10:19

**list** 24:7 48:5 52:8

**listed** 23:5

**litigation** 12:14 32:11

**live** 9:25 10:13

**lived** 17:21

**lives** 10:2 45:19

**LLC** 17:12

**long** 12:16 14:1

**looked** 38:20 43:14 49:5,25 50:4,5 51:7,8,23

**lot** 23:19 40:5

**Luke** 4:19 5:9

**M**

**made** 20:4 28:12 31:4 35:6,14 50:25

**Main** 4:25

**maintained** 21:2

**make** 26:9 28:2

**maker** 24:13

**makes** 49:8

**making** 23:14

**mandatory** 23:1 25:16,19 29:2,6 30:9 37:11 44:12 45:7

**manufacture** 29:14 32:23

**manufacturer** 28:21

**manufacturers** 34:6

**marital** 9:19

**mark** 15:11

**marked** 4:7, 11

**market** 27:5 33:1,20 54:14

**marketed** 33:3,6,8, 11

**married** 9:20 10:24

**Marsha** 10:18

**Mason** 8:18

**master's** 11:11 16:20,24

**Mattel** 25:5 37:14

**matter** 4:17

**matters** 16:3

**mattress** 34:18,19, 21 35:23, 24 36:1, 18,21 40:14 42:13 49:13

**mattresses** 35:23 36:9,15, 18,19 50:1

**meaning** 46:13

**means** 22:21

**medication** 8:13,16

**meet** 23:21 50:23

**meeting** 30:23

**meetings** 45:25 53:18

**meets** 37:9

**memory** 7:12

**merged** 11:25

**met** 25:10, 18 34:14 45:25 48:10 50:14

**meter** 36:6

**Midwives** 38:4

**minor** 4:19 6:6

**mission** 45:17

**mom** 18:19

**moment** 8:18

**months** 25:21

**Moore** 5:6,23 6:1,8,22, 24 9:9,11 15:15,18, 24,25 17:12 31:12,20 33:5,9,10 40:1 41:14,18, 25 42:16 55:20

**morning** 5:24,25

**moved** 17:18

**Mullins** 17:7,8,23, 24

**N**

**N-e-i-s-s** 24:3

**named** 25:10

**names** 6:5

**Nanny** 49:20, 21

**Nap** 49:20, 21

**nature** 50:13

**needed** 27:2

**NEISS** 24:3

**Nelson** 17:7, 8,23,24

**nephew** 10:2

**newborn** 37:19 43:4 47:15 54:21

**newspapers** 24:8

**Nicole** 10:11

**night** 41:11, 20 47:16, 20,24

**nods** 22:3 37:17

**Non-party** 4:7

**nonprofit** 12:20,24 13:19,22 14:21

**northern** 4:22 9:25

**notary** 6:23

**notice** 4:5,6 11:7 15:15 18:6 38:24 43:18,22 44:19 45:21 49:3

**noticed** 20:18

**Notification** 25:25

**November** 17:8,10, 23,24

**NPR** 45:4

**number** 4:15 15:11 22:22 23:2 25:7 27:23 38:25 39:7 42:6,8,25

**O**

**O-r-e** 9:11

**Obama** 15:1,2

**object** 39:24 41:13,23 55:10,11

**objections** 6:12

**occur** 32:22

**occurred** 28:6,17

**offer** 45:24

**offhand** 10:24

**office** 9:13 13:19 50:17

**Oftentimes** 7:21

**ongoing** 21:12,13 23:2 24:10

**online** 30:24 50:21

**opined** 47:20

**opinion** 54:3,7

**opinions** 54:1

**opportunity** 31:14

**oranges** 34:25

**order** 29:15 38:20 50:10

**org** 27:23

**organization** 12:20 13:20 15:8 23:9 24:13 40:5 45:24

**organizations** 14:21 19:18 22:16,23 23:4,18,23 27:24 29:13

**originally** 35:9

**outline** 9:5

**outspoken** 40:12

**P**

**p.m.** 56:3

**package** 30:18,20

**packages** 50:19

**pad** 49:13

**paid** 32:11

**paint** 16:16

**paragraph** 19:13 22:14 29:2

**parents** 6:3 25:10 40:7,19,23 41:3 42:4

**part** 26:5 30:18 33:16

**party** 37:16

**pass** 36:8, 16

**passed** 24:25 25:3,9

**Patty** 35:20 36:10

**Pedi** 40:3

**pediatrician** 53:7

**Pediatrics** 39:13,15, 20 40:4,11 43:11 45:10,14, 18 46:19, 21,24 53:21

**Pediatrics'** 43:13

**pending** 8:11

**people** 7:21 20:9 23:20 24:7 35:14 49:10,12 50:25 51:12,18

**percent** 42:25

**performance** 27:18 28:2 48:8 50:6
**period** 46:25
**Perry** 8:18
**person** 28:8
**person's** 10:8 28:8
**personal** 28:19,20 29:19 50:12 51:2
**personally** 7:9
**piece** 35:24
**pillows** 40:16
**Pineview** 11:5
**place** 7:12 40:8
**places** 42:15 43:1 45:21 48:17
**plaintiff** 21:15
**plaintiff's** 4:5,9 20:13 31:24 32:5
**plaintiffs** 4:20 21:1 43:5
**plaintiffs'** 20:12
**Play** 37:19 43:5,23 54:21
**pleadings** 29:23
**Policy** 12:22 13:24
**political** 27:11
**portable** 36:20
**position** 11:18 18:4,5 42:17,18 43:6,9 46:18 49:19 53:10,14, 23 54:4,5, 10
**positional** 48:25 49:2 51:23 53:11
**positionally** 51:5,22 52:3
**positioner** 47:11
**postterm** 51:5,21
**pounds** 36:3
**practice** 14:20 17:25
**prefer** 8:9
**preparation** 52:9
**present** 23:13
**President** 15:2
**prevent** 8:14
**previous** 6:9
**previously** 23:24 24:1
**primarily** 16:3
**primary** 48:13
**prior** 6:20 15:4,8 16:12 18:10
**process** 19:16,22 31:5,8
**Produce** 4:6
**produced** 30:19
**product** 14:25 15:4,5 17:16 18:14 19:17,23, 25 20:3 21:2 22:15 23:15,20 24:14,16, 18,25 25:25 26:5,16,22 27:3,4,17, 18 28:1,7, 9,11,18,21 29:12,18, 24,25 30:1,7,8, 25 31:10 32:16,20, 22,23,24, 25 33:16, 24 35:5 37:9,18,24 38:15,21 41:7,20,21 43:14 44:6,11, 12,13,25 46:4 47:2, 13,16,24 48:5,9 49:7 50:7, 13 51:6 52:1,19,20 53:1,2,4, 19,22 54:12,15, 20,22 55:5
**products** 19:8,20,22

20:21 22:18,24 23:24 24:1,8 25:13 27:9 29:7 31:6 34:6,10,19 35:8,15 37:5 38:14 41:6 42:6, 8 44:18,21 45:7 48:20 49:20,25 50:22 54:14,16, 20

**professionals** 27:10,11

**prompt** 19:24

**promulgate** 26:15

**prone** 36:12 49:19

**property** 16:10,11

**proposed** 31:4 38:24 39:6 43:19,22 44:19 45:21 49:3

**protect** 26:11

**provided** 8:20 32:2 47:9 48:6 50:19

**PS** 36:11

**public** 12:8, 13 30:23 31:2,3,7 34:4 44:3 45:22 49:11

**publish** 46:3

**purchasing** 16:10

**purposes** 6:11 9:4

**pushed** 25:21

**put** 36:4,6 41:8 46:22 47:3 48:21 49:13 51:12

**puts** 38:24

**Q**

**Qualifications** 29:4

**question** 6:15 7:18 8:10 55:12

**questioned** 53:22

**questions** 7:16,22 8:15,21 9:2,3

**R**

**ran** 13:3,6, 9,15,25 14:11,12, 15

**rate** 22:5

**rates** 32:21

**Ratner** 22:2

**read** 4:3 6:19,22 8:1 28:25 38:3 39:12 43:18 47:5,8 52:9,10,13 53:6,9,12, 14,17

**reading** 26:1,24

**realize** 49:15

**reasons** 51:8

**recall** 7:10 10:17 19:24 24:15 30:7 44:11 53:21

**recalled** 29:24 42:9 44:10 49:19

**recalls** 20:3

**received** 11:13

**receives** 6:21

**recess** 31:17 55:17

**recognize** 45:2 47:8

**recognizes** 44:13

**recommend** 44:15

**recommendation** 44:7 48:19 54:23

**recommendations** 47:17 48:12

**recommended** 45:6 52:2

**record** 4:12 5:5 8:5 31:16,18, 21 55:16, 18 56:1

**reduce** 26:21

**reelected** 13:16

**refer** 6:4,5

**reference** 25:15

**reflux** 53:12

**reforming** 12:25

**refresh** 7:11

**Register** 46:3,6,8

**regular** 39:17 54:2

**regularly** 50:15 51:18

**regulate** 27:17

**regulated** 16:7 53:1

**regulations** 16:16

**regulatory** 12:7,14 16:3,15

**relation** 19:16

**relationship** 19:18 22:14,15

**relatives** 9:24 10:13

**remediation** 21:7

**removed** 41:7 47:2,11,12 54:17

**rephrase** 7:20

**report** 4:10 8:24 9:5 15:21 19:13 23:6 28:24 31:25 32:5,8,19 33:21 52:9

**reporter** 5:2,14 6:21

**reports** 24:9

**represent** 5:7 6:2 21:9,10

**Representatives** 16:13

**representing** 21:15

**request** 23:13,14

**requested** 34:8

**require** 38:12,17

**required** 21:3,6 25:20

**requirements** 34:15,16

**requiring** 25:11

**research** 23:10,19 27:20 46:24 49:2

**reserved** 6:13

**respect** 19:2 20:18 45:13,15,16 46:8

**response** 25:3

**responsiveness** 6:16

**rest** 47:4

**restraint** 51:9,10

**resulted** 49:18

**Richard** 5:11

**risk** 26:21

**Rock** 37:19 43:5,23 54:21

**rockers** 35:6

**routine** 40:18 42:5,6,11,14 44:8 46:21 48:15,16 55:3

**routinely** 40:9,10,24 54:8,24 55:1,4,7

**Roy** 52:10 53:6

**rude** 8:4

**rule** 25:16,21,22 26:9,10 30:9,18,25 31:4,9 33:16 34:5,8,9,15 35:7,9,10,11,17,20 39:6 43:16,25 44:9,12,19,23 45:6,7 46:8 49:11 50:7,25 51:25 52:6,20

**rulemaking** 19:16 30:4 38:24 39:15 43:19,23 44:19 45:20,22 49:4

**rules** 6:12 24:21 25:20,23 29:2,6

31:8 50:17 51:18 53:25

**rulings** 50:11

**running** 13:19

S

**safe** 27:6 31:10

**safer** 28:3, 12

**saferproducts.gov** 24:6

**safety** 14:25 15:4,6 17:16 18:15,24 19:17,19, 21 20:20 21:2 22:15,17 24:18,25 25:25 26:6,16 29:12,19 32:16,20

**sale** 33:22

**Samuel** 11:2, 3

**satisfactory** 6:17,18

**Savannah** 21:17,19

**save** 45:19

**schedule** 25:19

**school** 11:6, 19 16:12, 21,23

**scientists** 27:13

**SDO** 23:9,13

**seat** 34:10

**seats** 18:16 42:19,21

**section** 25:11 26:14

**separate** 34:8,9

**Services** 12:9 27:22

**set** 38:3

**SGS** 37:7 48:7

**short** 26:1, 13 31:12 55:13

**shoulders** 46:14

**show** 15:10 26:2 31:22

**sic** 36:5

**sign** 4:3 6:19,23

**Simmons** 11:25

**single** 45:15

**Sinkler** 11:25 12:1 13:6,18

**sir** 6:17

**sit** 38:18

**sites** 16:9

**sitting** 52:1

**situation** 20:24

**sleep** 19:21 34:6 35:8, 14 40:7,9, 14,21,24 42:3 43:8 44:8,18,20 46:21,22 47:4,10, 16,24 48:15,16 54:10,22 55:4

**sleeper** 24:19 27:4 29:20,23 33:2 37:19 38:22 39:21 41:4,11,20 43:5,24 44:14,16 47:11,15 51:12 54:21

**sleepers** 19:3 40:25 43:17,20 44:1,10 46:9 49:4

**sleeping** 42:5,11,14 43:13 44:16 53:15

**Social** 12:9

**soft** 49:13, 22,23,25 50:1 51:11,13

**sold** 37:19, 20,25 42:8

**sort** 9:5

**South** 4:25 9:15 11:4, 14,24 12:21 13:23

**southern** 14:21

**spell** 10:20

**spends** 48:4

**staff** 25:18 34:2,3 50:15,23

**standard** 23:7,12, 14,21 24:14 25:4 27:1 28:2, 14 33:14, 25 34:2 37:9 38:2, 11

**standards** 18:24 19:19,21 20:4 22:17,23, 25 23:1,2, 6,8,23 24:12 25:12,15 26:16,18, 19,21 27:6,18,24 30:8 37:22 38:8,9 50:6

**standpoint** 18:17,19 48:1

**start** 17:5

**started** 12:20,24 17:11,25 18:14 24:17 25:5

**state** 13:3, 12,17 14:1,15

**state's** 12:25

**stated** 20:18 39:11

**statement** 22:9 29:3

**States** 4:21 22:24 26:15 33:22 37:21 38:14

**stationary** 42:21

**status** 9:19

**statute** 26:25

**stipulated** 4:1

**STIPULATIONS** 4:1

**storage** 16:6

**Street** 4:25 9:14

**Strike** 18:11

**stringent** 26:10,11, 19,20 27:2

**Strollers** 42:18

**stronger** 38:11

**student** 48:14

**studies** 51:24

**studs** 21:4

**substantial** 19:23

**substantially** 26:17

**substitute** 49:13

**sued** 12:9

**suffocation** 36:13

**Suite** 9:14

**sulfide** 20:23,25 21:8

**Superfund** 16:9

**superintendent** 13:4,9,12, 17 14:1,8, 16

**supervised** 40:18

**supine** 42:17,18 43:9 46:23 47:3,13

**supporting** 52:6

**surface** 43:9 46:23 53:15

**swear** 5:14

**swings** 19:5

**sworn** 5:17 14:9

**system** 12:25

**T**

**T-e-n-e-n-b-a-u-m** 9:10

**table** 8:11

**takes** 7:12

**taking** 24:22 44:4

**talk** 30:3, 6,15 39:1 45:3 50:17,23, 25 51:1

**talking** 32:25 35:24 36:13 43:4 46:20 51:1

**tanks** 16:6

**Tate** 11:22

**technical** 18:16,23

**telephone** 39:7

**ten** 36:7,15 46:11

**tendency** 7:21

**Tenenbaum** 4:7,11,16 5:16,24 6:19,25 9:9 11:2,3 15:12 17:12 20:8 23:25 31:22

**tenure** 14:18 17:6,15 18:14

**term** 14:3,4

**terms** 23:6

**test** 36:2, 8,16,21 37:4 48:3

**tested** 30:9 33:18,20, 23 34:13 38:15 53:1

**testified** 5:17 20:14,17

**testify** 22:13 29:17

**testifying** 50:9

**testimony** 20:2

**testing** 19:7 27:14 29:14 36:23 37:4,8 38:12 48:1,25 50:12 51:1

**tests** 27:9 48:7

**thing** 28:4

**things** 16:15 20:11 52:8

**thought** 51:25

**thousand** 22:5

**Thurston** 5:2

**till** 13:2 14:23

**time** 6:13, 20 8:7 13:7 16:14 20:18 30:9 40:18 42:25 44:3 45:15

**times** 7:1 25:11 46:1

**title** 26:13, 15

**today** 15:20

**Today's** 4:13

**toddler** 29:7

**told** 12:23

**toxic** 20:24

**toy** 25:5

**toy-type** 20:24

**toys** 40:16

**transcript** 4:3

**transpired** 31:17 55:17

**travel** 18:6

**trial** 6:13

**tummy** 40:18

**turn** 27:5,6 49:17,21 51:10

**turned** 51:13

**turning** 49:18

**types** 44:20

**typically** 23:1,8 30:16

**U**

**U.K.** 37:25 38:4,12,17

**U.S.** 14:24 19:16 21:2

**uh-huh** 7:22, 24 8:3 10:7 43:21 50:20 55:6

**uh-uh** 7:23

**UL** 22:23 37:7

**undergraduate** 11:10

**underground** 16:6

**understand** 7:19 32:20

**understanding** 6:9 8:14

**understood** 7:17

**undertakes** 19:22

**Union** 51:17

**unique** 45:21

**United** 4:21 22:24 26:15 33:22 37:21 38:14

**University** 11:8,9,14 16:25

**V**

**vapors** 21:1

**variety** 20:10

**Veritas** 33:23 34:13 36:25 37:3,7,13 48:6

**versions** 44:2

**versus** 4:20

**vetted** 31:6

**video** 4:15 36:11

**voluntary** 19:19,20 20:3 22:17,22, 25 23:2,7, 12,14,21, 22 24:14 25:4 26:17,19 27:24 28:14 30:8 33:14 37:12

**vote** 44:4

**W**

**waive** 4:2

**warn** 41:3

**Washington** 17:20,21

**wears** 8:2

**website** 24:7 35:19

**weekend** 17:19,20

**weeks** 51:21

**weighs** 36:3

**weight** 45:9, 11

**wife** 10:10

**woman's** 39:18

**won** 13:10, 13

**word** 29:15 40:9 48:15 54:24 55:3

**work** 11:19 12:24 16:2,8 23:3 29:13 30:15 37:21 49:11

**worked** 14:20 16:1,13 28:25 39:14 40:6,20

**working** 13:19 18:13 23:7 24:17 44:12

**workings** 20:2

**works** 23:16, 22 27:15, 19,21 40:4

**world** 22:25 37:4,5,6

**worried** 49:12 52:23

**write** 25:12 28:2

**writing** 44:9 46:2

**written** 45:24

**Wyche** 9:17 17:5,10,13 18:1,2,7

**Y**

**year** 17:11, 12,13,25 45:8

**years** 12:17 13:17 14:22,23 16:2,14 17:8,9,22 21:21

**youth** 12:11

**Yvonne** 5:2