# W Y C H E

Attorneys at Law

**December 15, 2017**

## EXPERT WITNESS REPORT OF INEZ M. TENENBAUM

At the request of counsel for Fisher-Price, I have been retained as an expert in the matter of *Goodrich v. Fisher-Price* to provide expert opinion on the process of rulemaking by the U.S. Consumer Product Safety Commission ("CPSC"), the relationship between the CPSC and organizations that develop voluntary safety consensus standards for consumer products, the ASTM voluntary safety standards for infant inclined sleep products, and the process that CPSC undertakes to determine if a substantial product hazard exists that would prompt the CPSC to issue a recall of a product. I am being compensated for my work at my current standard hourly rate.

### I. Statement of Qualifications

#### *A. Chairman of the U.S. Consumer Product Safety Commission*

I served as the Chairman of the U.S. Consumer Product Safety Commission from June 2009 to November 2013. During my tenure, the CPSC implemented the Consumer Product Safety Improvement Act of 2008 (CPSIA); launched the publicly available Consumer Product Safety Information Database, available at www.SaferProducts.gov; promulgated numerous mandatory rules for infant and toddler durable products; promulgated the testing and certification rules for children's products; and working with Customs and Border Protection, screened thousands of consumer products that were in violation of the U.S. standards, or were otherwise unsafe, and stopped them from reaching store shelves. I also oversaw several education initiatives aimed at decreasing injuries and deaths to consumers, particularly children. Attachment 1 is a copy of the report, *CPSC Accomplishments from 2009-12,* which is available on the CPSC's website, www.cpsc.gov. Attachment 2 is my biographical information.

#### *B. Experience With Infant and Toddler Safety Standards*

The Danny Keysar Child Product Safety Notification Act, section 104 of the CPSIA,[1] requires the CPSC to promulgate consumer product safety standards for durable infant or toddler products. I worked closely with the CPSC career employees who coordinated with the ASTM to develop mandatory rules for these infant and toddler products. During my tenure the CPSC promulgated these mandatory rules based on ASTM standards for infant durable products, on which I voted to approve:

- Bassinets and Cradles (16 C.F.R. § 1218)
- Crib Safety Standards (full size) (16 C.F.R. § 1219)

[1] Consumer Product Safety Improvement Act, Pub. L. 110-314, 122 Stat. 3016 (Aug. 14, 2008); amended by H.R. 2715, Pub. L. 112-28 (Aug. 12, 2011).



EXHIBIT 2
Deponent Tenenbaum
Date 2-28-18 Rptr. UB
WWW.DEPOBOOK.COM

- Crib Safety Standards (non-full size) (16 C.F.R. § 1220)
- Infant Swings Safety Standards (16 C.F.R. § 1223)
- Infant Walker Safety Standards (16 C.F.R. § 1216)
- Play Yard Safety Standards (16 C.F.R. § 1221)
- Portable Bed Rails Safety Standards (16 C.F.R. § 1224)
- Registration Cards for Durable Infant or Toddler Products (16 C.F.R. § 1130)
- Toddler Beds Safety Standards (16 C.F.R. § 1217)
- Federal Toy Standard—ASTM F.963 (16 C.F.R. § 1250)
- Testing and Certification of Children's Products (16 C.F.R § 1107)

Because of my experience in developing rules for infant durable equipment during my tenure at the CPSC, I am very familiar with the process of working with the CPSC staff, ASTM, and child safety advocates to promulgate rules for children's products. The rulemaking process is a public-private effort in which the interests and points of view of all parties are considered and vetted. The employees of the CPSC may only be involved in the development of voluntary safety consensus standards if the meetings and proceedings are open to the public for attendance and observation.[2]

*C. National Education Campaign on Infant Safe Sleep*

During my tenure as Chairman, the CPSC launched the "Safe Sleep for All Babies" national education campaign on crib safety for new and expectant parents. The purpose of this education campaign was to help all new parents avoid suffocation, strangulation, and entrapment risks for babies in sleep environments. The CPSC's safe sleep initiative was a multipronged effort to reduce deaths and injuries associated with unsafe sleep environments. The CPSC's partners in this safe sleep initiative were the American Academy of Pediatrics and Keeping Babies Safe. I interacted frequently with both of these organizations, along with other child safety organizations, during my tenure as Chairman of the CPSC. Because of my work as CPSC Chairman on the durable infant and toddler products, Kids in Danger presented me with their *Best Friend Award* in 2014.

## II. Scope of Testimony and Anticipated Opinions

Plaintiffs allege that their infant child sustained injuries and damages while lying in a Fisher-Price Rock n' Play Sleeper and that Fisher-Price was both negligent and grossly negligent in manufacturing the sleeper because it created an unreasonable risk of harm to the user. They allege the sleeper was defective because it provided for a 30° sleeping surface. Plaintiff admits that she did not use the restraint system because she thought that the strap and buckle that were attached to the sleeper were "too large" for the infant's small size "as it was too loose at the crotch and too high and flimsy at the exit points on the seat." The infant was put unrestrained in the inclined sleeper, and a blanket was tucked around the infant's torso. The infant was later found by his maternal grandmother

[2] 16 C.F.R. § 1031.13(c).

who picked him up, and after several moments the infant started breathing normally. I have been asked to analyze the subject product and the applicability of any federal law, mandatory rule, or voluntary consensus safety standard for the product.

Based on my analysis of these issues, I provide the following opinions:

- The Fisher-Price Rock n' Play Sleeper complied with all federal laws, and rules enforced by the CPSC, and the sale of the product was not in violation of any CPSC mandated rules or industry consensus safety standard.
- The product was tested and certified pursuant to CPSC's requirements for children's products before being imported and offered for sale.
- The product was tested and certified pursuant to CPSC's requirements for children's products to the crib and bassinet standards and later to the inclined sleep product standards.
- While Fisher-Price was directed by the CPSC to issue a Recall to Inspect notice in 2013 and provide additional cleaning instructions to consumers in response to reports of mold by some consumers, the product was not recalled by the CPSC because it did not have a substantial product hazard that required the CPSC to recall it.
- The applicable ASTM Standard33 for inclined sleep products up to 30$^{o}$ has been reviewed by the CPSC and, following unanimous approval by the Commission for publication in the Federal Register, is currently the subject of a proposed mandatory rule that will convert the ASTM Standard for inclined sleep products up to 30$^{o}$ to a federal regulation.
- The CPSC identifies and incorporates "best practices" for particular products to establish mandatory juvenile product standards under the Consumer Product Safety Improvement Act. [3]

## III. Compliance with Federal Statutes

The Fisher-Price Rock n' Play Sleeper complied with federal laws and regulations enforced by the CPSC and the voluntary consensus safety standards applicable to the product at the time of manufacture, importation, and sale.

The U.S. Consumer Product Safety Act (CPSA),[4] section 14(a)(2)(B), requires every manufacturer and private labeler of a children's product subject to a children's product safety rule to have the product tested by a CPSC accredited laboratory for compliance with all applicable children's product safety rules. Based on the results of the third party testing, the manufacturer must issue a certificate known as a Children's Product Certificate (CPC) before the product is imported for consumption or warehousing or distributing into commerce. Fisher-Price complied with this provision by having Bureau

---

[3] www.cpsc.gov/Regulations-Laws-Standards/Voluntary-Standards.gov, p.1.
[4] 15 U.S.C. §§ 2051-2089.

Veritas test the product on August 28, 2009, to ensure that it met all the product safety rules for the product applicable at the time of manufacture and sale. Bureau Veritas determined that the product met all U.S. requirements and the ASTM F2194—07 standard for bassinets and cradles. Most recent third party testing by SGS reveals that the Rock 'n Play complies with ASTM F3118-15 and F3118-17 for inclined sleep products.

## IV. Mandatory Standards

The Danny Keysar Child Product Safety Notification Act, section 104 of the U.S. Consumer Product Safety Improvement Act of 2008 (CPSIA), requires the CPSC to promulgate consumer product safety standards for durable infant and toddler products in consultation with representatives of consumer groups, juvenile product manufacturers, and independent child product engineers and experts.[5] Section 104(f)(1) of the CPSIA defines the term "durable infant or toddler product" as "durable product intended for use, or that may be reasonably expected to be used, by children under the age of 5 years."[6] These standards are to be "substantially the same as" applicable voluntary standards, or "more stringent than voluntary standards, if the Commission determines that more stringent standards would further reduce the risk of injury associated with the products."[7] The CPSC staff began developing standards on various infant and toddler durable products by consulting with representatives from consumer groups, juvenile product manufacturers, and independent child product engineers and experts.

At the time that Fisher-Price manufactured the Rock n' Play Sleeper, the CPSC had not promulgated a mandatory standard for infant inclined sleepers. Initially, inclined infant products were considered by the CPSC staff to fall within the scope of the bassinet/cradle standard, but determined later that the inclined sleep products needed to be a separate standard. The Commission directed the staff to separate inclined sleep products into a separate rule that addressed products with an incline greater than 10$^{\circ}$ from horizontal.[8] The CPSC is now considering a proposed rule on inclined sleepers based on the ASTM F3118-17 standard, *Standard Consumer Safety Specification for Inclined Sleep Products.* Once the CPSC finally has approved the ASTM F3118-17 standard, it will be a mandatory federal rule under the Consumer Product Safety Act.[9]

## V. Voluntary Standards

Voluntary standards for consumer products are developed by standards development organizations (SDOs) such as ASTM, ANSI, CSA, UL, and others through a consensus process involving industry, consumer advocates, government, and other

[5] Consumer Product Safety Improvement Act, Pub.L.110-314, 122 Stat.3016 (Aug. 14, 2008), § 104(b)(1) (A).
[6] *Id.* at §104 (b)(1)(B).
[7] *Id.*
[8] CPSC Safety Standard for Infant Sleep Products, Notice of Proposed Rulemaking, 16 C.F.R. Parts 1112, 1130, and 1235, p. 3-4 (Feb. 2, 2017).
[9] *Id.* at 4.

interested parties. A voluntary standard is also called a safety standard or a consensus product standard. The CPSC is required by statute to rely on voluntary standards rather than promulgate mandatory regulations if compliance with a voluntary standard would eliminate or adequately reduce the risk of the identified injury, and it is likely that there would be substantial compliance with the voluntary standard.[10]

When the CPSC staff, after analyzing consumer product incident data, determines that a voluntary standard is necessary for consumer product safety, the CPSC staff submits a recommendation to an SDO for the development of a standard. The CPSC staff participates actively in the voluntary standards activities and provides injury data and hazard analyses; encourages the development or revision of voluntary standards; identifies specific risks with particular products; performs research; develops health science data; performs laboratory technical assistance; and takes other actions that the Commission determines to be appropriate.[11]

The process for the voluntary standard development is described by the CPSC in the following excerpt:

> Typically, an SDO will organize a group, which then performs a technical assessment and prepares a draft standard for public comment. During this comment period, CPSC staff provides expert advice, technical assistance, and clarifying analyses. After evaluating and incorporating public comments received on the proposal, the group developing the standard's provisions votes on the final voluntary standard. Once the voluntary standard is approved, it usually becomes the recognized norm for that industry group and product type.[12]

The Fisher-Price Rock n' Play Sleeper that is the basis of this law suit was manufactured on June 3, 2011. The voluntary standard that applied to the product on this date was the ASTM International F2194—10, *Standard Consumer Safety Specification for Bassinets and Cradles*, approved by the ASTM Committee F15.18 on April 1, 2010. This standard covered bassinets and cradles that were defined as:

> [S]mall bed for infants supported by free swinging legs, a wheeled base, a rocking base, or which can swing relative to a stationary base.[13]

The Fisher-Price Rock n' Play at issue in this law suit met the voluntary standard applicable to the product at the time of manufacture and sale to the consumer. The product was recognized as one in which an infant would sleep or recline.

[10] 15 U.S.C. §2056(b)(1).
[11] *CPSC Strategic Plan 2016-2020,* Appendix E, p. 52.
[12] *CPSC 2011 Performance and Accountability Report*, p. 5.
[13] ASTM F2194—10 (Apr. 1, 2010). ASTM had an earlier standard for bassinets and cradles, F2194—07, (Feb. 1, 2007) in which the product was described as it was in ASTM F2194—10.

ASTM International updated its standard for bassinets and cradles, F2194—12a,[14] effective September 1, 2012, in which the product was defined as:

> [S]mall bed designed primarily to provide sleeping accommodations for infants, supported by free standing legs, a stationary frame/stand, a wheeled base, a rocking base, or which can swing relative to a stationary base. While in a rest (non-rocking or swinging) position, a bassinet/cradle is intended to have a sleep surface less than or equal to 10° from horizontal.

Several years later, at the request of the CPSC, ASTM developed F3118—15, *Standard Consumer Safety Specification for Infant Inclined Sleep Products*[15] to separate infant inclined sleep products from the bassinet and cradle standard. Infant inclined sleep product is defined in F3118—15 as:

> [A] freestanding product, intended to provide a sleeping accommodations for an infant up to approximately 5 months of age, that is supported by a stationary or rocker base with one or more inclined sleep surface positions for the seat back that are greater than 10° and do not exceed 30° from the horizontal.

The current voluntary standard for infant inclined sleepers is ASTM F3118—17 *Standard Consumer Safety Specification for Infant Inclined Sleep Products.* This standard is the basis for the CPSC's proposed mandatory rule on newborn inclined sleeper products developed pursuant to Danny Keysar Child Product Safety Notification Act, section 104. The introduction to the rule states:

> This consumer safety specification addresses incidents associated with infant inclined sleep products identified by the U.S. Consumer Product Safety Commission (CPSC).
>
> In response to incident data compiled by the CPSC, this consumer product safety specification attempts to minimize the following: (1) fall hazards, (2) positional asphyxiation, (3) obstruction of the nose and mouth by bedding. This consumer safety specification is intended to cover normal use and reasonably foreseeable misuse or abuse of inclined sleep products. This specification does not cover inclined sleep products that are blatantly misused or used in a careless manner that disregards the safety instructions and warnings provided with each inclined sleep products.
>
> This consumer safety specification is written within the current state-of-the art of infant sleep product technology and will be updated whenever

---

[14] ASTM F2194—12a (Sept. 1, 2012)
[15] ASTM F3118—15 (Apr. 1, 2015)

> substantive information becomes available that necessitates additional requirements or justifies the revision of existing requirements.[16]

The definition of newborn inclined sleep product in the current ASTM safety standard is:

> [A] free standing product, intended to provide sleeping accommodations for a newborn up to approximately 3 months of age, that is supported by a stationary or rocker base with one or more inclined sleep surface positions for the seat back that are greater than 10° and do not exceed 30° from the horizontal and whose seat back length, measured from the bight, is not greater than 17 in. (432 mm).[17]

The Fisher-Price Rock n' Play has met the requirements of all ASTM voluntary consensus standard. At the time of its development and original design, it met ASTM 21974—7. At the time of manufacture, import, and sale to the consumer it met ASTM F2194—10 as well as all successive ASTM standard for infant inclined sleep products: ASTM 3118—15, and ASTM 3118—17. The development of these ASTM standards has been a collaborative effort in which members of industry, trade associations, child advocates, and CPSC staff worked to develop a standard for the product. The American Academy of Pediatrics, along with other child safety advocates, has been represented on the committees that develop these standards.

## VI. CPSC Recall Requirements

The U.S. Consumer Product Safety Commission (CPSC) is an independent federal agency whose mission is protecting the public against unreasonable risks of injuries or deaths from consumer products.

*Duty to Report*

Section 15(b) of the Consumer Product Safety Act (CPSA)[18] requires a manufacturer, importer, distributor and/or retailer of consumer products to report "immediately" (defined by the CPSC at within 24 hours) information concerning a product that:

- fails to comply with an applicable consumer product safety rule or with a voluntary consumer product safety standard upon which the Commission has relied under section 9;
- fails to comply with any other rule, regulation, standard, or ban under the CPSA or any other safety statute enforced by the CPSC;
- contains a defect that could create a substantial product hazard; or

[16] ASTM F3118—17, p.1 (Jan. 1, 2017).
[17] *Id.* at p. 3.
[18] 15 U.S.C. §§ 2051-2089.

- creates an unreasonable risk of serious injury or death.[19]

The Consumer Product Safety Act defines "substantial product hazard" as either

> (1) the failure to comply with an applicable consumer product safety rule under this Act or a similar rule, regulation, standard, or ban under any other Act enforced by the Commission which failure creates a substantial risk of injury to the public, or
> (2) a product defect which (because of the pattern of defect, the number of defective products distributed in commerce, the severity of the risk, or otherwise) creates a substantial risk of injury to the public. [20]

A product defect is defined at a minimum as "a fault, flaw, or irregularity that causes a weakness, failure, or inadequacy in form or function."[21] A defect may be the design of the product or the result of a manufacturing or production error. A defect may also occur in the product's contents, construction, finish, packaging, warnings, and/or instructions.

Because the Fisher-Price Rock n' Play Sleeper met the consensus safety standard, ASTM F2194—10, at the time that the product was manufactured and sold, the product did not have substantial product hazard that would have required a product recall by the CPSC. The product has also met successive consensus safety standards—ASTM F3118—15 and ASTM F3118—17 *Standard Consumer Safety Specification for Inclined Sleep Product.*

The Fisher-Price Rock n' Play Sleeper did not contain a substantial product hazard as defined by the Consumer Product Safety Act[22] because the product did not fail to comply with an applicable consumer product safety rule. The product complied with the applicable industry consensus safety standard at the time of manufacture and sale.

## VII. Documents Reviewed for Expert Report

- CPSC's Notice of Proposed Rulemaking *Safety Standard for Infant Inclined Sleep Products*, 16 C.F.R. Parts 1112, 1130, 1236; 82 FR 17000, Apr. 7, 2017.

- ASTM International F2194-07, *Standard Consumer Safety Specification for Bassinets and Cradles*, Feb. 1, 2007.

- ASTM International F2194-10, *Standard Consumer Safety Specification for Bassinets and Cradles*, Apr. 1, 2010.

[19] 15 U.S.C. § 2064 (b).
[20] 15 U.S.C. §2064(a).
[21] 16 C.F.R. §1115.4.
[22] 15 U.S.C. § 2064(a).

- ASTM International F2194-12a, *Standard Consumer Safe Specification for Bassinets and Cradles,* Sept. 1, 2012.
- ASTM International F3118-15, *Standard Consumer Safety Specification for Infant Inclined Sleep Products*, Apr. 1, 2015.
- ASTM International F3118-17, *Standard Consumer Safety Specification for Inclined Sleep Products,* Jan. 1, 2017.
- Benaroch, Roy, M.D. Report, Sept. 26, 2017.
- *AAP Expands Recommendations on SIDS and Other Sleep-Related Deaths*, American Family Physician, May 1, 2012.
- Kornhauser, Lilijana, *A Comparison of Respiratory Patterns in Healthy Term Infants Placed in Car Safety Seats and Bed,* PEDIATRICS, Vol. 124, Issue 3, Sept. 2009.
- *SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment*, PEDIATRICS, Vol. 138, No. 5, Nov. 2016.
- *SIDS and Other Sleep-Related Infant Deaths: Expansion of Recommendations for a Safe Infant Sleeping Environment*, PEDIATRICS, Vol. 128, No. 5, Nov. 2011.
- Gaudreau, Paul, Report and Supplemental Report.
- Depositions of Mr. and Mrs. Goodrich, Ms. Hinson, Dr. Benaroch, and Mr. Gaudreau.
- Bureau Veritas Technical Report (5209) 229-0035, Fisher-Price Infant Rock n' Play Sleeper, Aug. 28, 2009.
- SGS Test Report No. GZHG15120522134JP, Fisher-Price Infant Rock n' Play Sleeper, Dec. 31, 2015.
- SGS Test Report No. GZHL1604012750JP, Fisher-Price Infant Rock n' Play Sleeper, Apr. 14, 2016.
- SGS Test Report No. GZHG1512052575JP, Fisher-Price Infant Rock n' Play Sleeper, Dec. 7, 2016.
- SGS Test Report No. GZHL1701000324JP, Fisher-Price Infant Rock n' Play Sleeper, Jan. 17, 2017.

- SGS Test Report No. GZHL1707033195JP, Fisher-Price Infant Rock n' Play Sleeper, Aug. 10, 2017.
- CPSC Recall to Inspect Notice, "Fisher-Price Recalls to Inspect Rock N' Play Infant Sleepers Due to Risk of Exposure to Mold," Recall No. 13-087, Jan. 8, 2013.
- CPSC 2011 Performance and Accountability Report, Nov. 2011.
- CPSC Strategic Plan 2011-16.
- CPSC Strategic Plan 2016-20.
- CPSC Fiscal Year 2017 Operating Plan, Oct. 19, 2016.
- Consumer Product Safety Act, 15 U.S.C. §§2051-2089.
- Consumer Product Safety Improvement Act. Pub.L.110-314, 112 Stat. 3016 (Aug. 14, 2008), amended by Pub. L. 112-28 (Aug. 12, 2011).
- Code of Federal Register, Title 16, Part 1000 to End.
- www.cpsc.gov

## VIII. Prior Depositions

In 2016, I was retained as an expert in the matter of *Ratner v. Georgia-Pacific Consumer Products*, Civil Action No. SU11CV343W, Superior Court of Effingham County, State of Georgia. I was retained for the purpose of testifying about the U.S. Consumer Product Safety Commission's remediation guidelines for homes effected with hydrogen sulfide emissions from drywall, manufactured and imported primarily from China, during my tenure as Chairman of the U.S. Consumer Product Safety Commission, 2009-13. I was deposed on July 28, 2016.

## IX. Compensation

I am being compensated at my usual hourly rate of $1,000 per hour.

**Attachment 1**

United States
CONSUMER PRODUCT SAFETY COMMISSION

# CPSC Accomplishments from 2009-2012

**April 16, 2013**

**Leadership in Product Safety**

CPSC is at the forefront of advancing the agenda for consumer product safety and takes a leadership role in identifying and addressing the most pressing consumer product safety priorities and mobilizing action by our partners. By collaborating with key global and domestic stakeholders, CPSC leverages its limited resources to improve product safety and mitigate the most pressing product safety hazards.

- In 2010, CPSC created the Office of Education, Global Outreach, and Small Business Ombudsman to coordinate and provide outreach to various domestic and international stakeholders, including manufacturers, retailers, resellers, small businesses, and foreign governments. The office is dedicated to addressing the questions and concerns of the regulated community.
- CPSC created a full-time Small Business Ombudsman position in FY 2011 to serve the nation's many small businesses in the area of product safety.
- CPSC participated in Bilateral Summits with China in October 2009 and October 2011.
- In 2009, CPSC established its first overseas office, located at the U.S. Embassy in Beijing.
- In October 2011, CPSC led the first North American Consumer Product Safety Summit with Canada and Mexico.
- In June 2012, CPSC sponsored a Trilateral Summit with China and the European Union.
- CPSC trained 17,000 executive, quality control, and manufacturing professionals throughout the world in 2011 and 2012.
- Comprehensive campaigns were held in 2011 to educate businesses on the lifting of existing stays of enforcement in 2012. Another campaign focused on changes to the toy standard, F-963-11. Campaigns consisted of webinars, new Web pages, and a focused effort to support associations and trade groups through presentations at trade shows and other events.
- In 2012, in collaboration with regulators in Australia, Japan, Korea, and New Zealand, CPSC, together with KidSafe, organized a multijurisdictional symposium on technological solutions that could eliminate or mitigate the hazards posed by ingested button batteries.
- CPSC led the effort by the Working Party on Consumer Product Safety of the Organisation of Economic Cooperation and Development to establish the first global recalls portal. The portal launch occurred on October 19, 2012. This effort was the culmination of 18 months of work.

The CPSC delegation led the team of five jurisdictions in the design and implementation of this project.

- Awarded the Chairman's Commendation Circle Award to recognize people and groups that have contributed in an important way to the benefit of consumers by directly and significantly reducing deaths, preventing injuries, and improving consumer product safety. Since the program was revived in 2011, there have been nine Chairman's Commendation Circle Award recipients.
- In 2012, CPSC began an innovative public-private collaboration to work on lowering the risk of concussions and other mild traumatic brain injuries at the youth football level. The "Youth Football Brain Safety" initiative involved major companies that manufacture or recondition football helmets, industry associations (the National Athletic Equipment Reconditioning Association and the Sporting Goods Manufacturers Association), the National Football League (NFL), the National Football League Players Association (NFLPA), USA Football (the official youth football development partner of the NFL and the NFLPA), the Centers for Disease Control and Prevention (CDC), and the National Collegiate Athletic Association (NCAA). Through private funding, the program provides assistance to football programs for economically disadvantaged youth, outfitting their players in newer and properly maintained helmets, provided those programs comply with CPSC- and CDC-supported comprehensive education efforts administered by USA Football aimed at driving a fundamental safety culture change in the sport.

**Commitment to Prevention**

CPSC protects consumers by promoting production of safe consumer products and development and implementation of safety standards for manufacturers, which focus on safety early in the supply chain and help prevent hazards from entering consumer markets in the first place. CPSC participates in the development of voluntary safety standards, issues mandatory safety rules, trains industry stakeholders on regulatory requirements and hazard identification best practices, and engages foreign product safety regulators and foreign manufacturers to reduce production of unsafe consumer products that could enter the U.S. market. Since passage of the Consumer Product Safety Improvement Act (CPSIA) in 2008, CPSC has focused on implementing significant portions of the Act.

- <u>Consumer Product Safety Improvement Act of 2008 (CPSIA)</u>: CPSC has implemented significant portions of the CPSIA by conducting testing and technical review activities, developing proposed rules, and developing final rules for various products. Key new rules affect cribs (making crib standards the toughest in the world), durable infant and toddler products, tracking labels for children's products, a lower lead content limit for children's products, and laboratory accreditation and third party testing requirements. As of September 30, 2012, CPSC had completed 96 CPSIA-related rulemaking activities since CPSIA passage in

2008, including 30 final rules and 20 accreditation requirements. Information on all CPSIA activities can be found at: www.cpsc.gov/about/cpsia/cpsia.html.

- CPSC completed 40 final rules—at a record setting pace—since the adoption of the CPSIA through 2012, including,:
    - mandatory rules for durable infant or toddler products, including: cribs, infant bath seats, infant walkers, toddler beds, portable bed rails, infant swings, and play yards;
    - a rule on Testing and Labeling Pertaining to Product Certification;
    - a rule on Conditions and Requirements for Relying on Component Part Testing to Meet Certification Requirements;
    - a rule on Guidelines and Requirements for Mandatory Recall Notices;
    - rules designating certain children's upper outerwear and certain hand-held hair dryers to be substantial product hazards under 15(j) of the CPSA; and
    - a rule on Requirements for Consumer Registration of Durable Infant or Toddler Products.

- As more consumer products employ nanotechnology, concerns are increasing regarding the potential health effects associated with human exposure to nanoparticles. From 2009 to 2012, CPSC staff collaborated with several federal agencies and consulting groups to conduct needed research to help address these concerns. Interagency agreements were established with the U.S. Environmental Protection Agency, the U.S. Food and Drug Administration, the National Institute for Occupational Safety and Health, the National Institute for Standards and Technology, the National Institutes of Health/National Library of Medicine, and the National Science Foundation. Contracts were established with Toxicology Excellence for Risk Assessment (TERA) and Versar, Inc./Syracuse Research Foundation. The academic institutions that were supported through these collaborations include: Duke University, Harvard University, Rutgers University, and the Virginia Institute of Technology.
    - Specific nanotechnology research areas CPSC has focused on include: release of nanomaterials from children's products, cookware, clothing and textiles, household chemicals and cleaners, floor finishes, paints, printer inks and toners, and sports equipment; the use of nanomaterials as flame retardants; the health effects of nanomaterials released into the air; and the development of computer models to determine health risks. More than 25 substantive research reports have been completed.

- In response to the direction of section 108 of the CPSIA, the Commission appointed a Chronic Hazard Advisory Panel (CHAP) in 2010 to study the effects on children's health of all phthalates and phthalate alternatives as they are used in children's toys and child care articles.
    - The CHAP's first meeting took place April 14-15 2010, and six additional meetings were held between July 2010 and February 2012. All meetings were open to the public, and videos of the meetings, as well as all information pertaining to each meeting (agenda, meeting log, public notice, and list of attendees) was posted on the CPSC website for access by the public. Reports and presentations from CPSC staff

and from all nongovernment participants in the CHAP meeting were posted on the CPSC website as well. Currently, the CHAP is in the process of completing its draft report.

- CPSC staff hosted a public symposium, Phthalates Screening and Testing Methods, on March 1, 2012, attended by more than 50 people in person and via webcast.
    - The Commission approved a final guidance document on inaccessible component parts of children's toys and child care articles containing phthalates, and the guidance document was peer-reviewed and then published in the *Federal Register* on February 14, 2013.

- In August 2012, in collaboration with Saint Louis University, CPSC led a Regional Summit for manufacturers and other safety professionals on Supply Chain Integrity.
- CPSC held the first CPSC Safety Academy in FY 2012 for more than 100 representatives of manufacturers, retailers, distributors, associations, and government organizations to provide training and discussion of CPSC's regulations.
- In October 2012, CPSC held an ATV Safety Summit, which provided stakeholders a venue to share information and lessons learned regarding public awareness, information and education, training, and technology. Additionally, comments received from the public at this event were reviewed by staff to prepare a briefing package to the Commission for a draft final rule of an open rulemaking proceeding for all-terrain vehicles.
- CPSC's support of the toy industry has also included outreach at the Commissioner level in addition to technical staff. To help ensure that imports meet the standard, CPSC has sent staff to Germany and China to educate exporters on U.S. requirements. Support of small crafters and other handmade toys has been extensive.
- CPSC held an educational roundtable in 2011 as part of its outreach to the business community.
- Between 2009 and 2013, CPSC leadership and staff have participated in or organized dozens of product safety training events, numerous events in China and others in Southeast Asia and Latin America. These events have reached thousands of foreign manufacturers and government regulators with information about U.S. requirements, in person and via the Internet.
- CPSC inaugurated its International Extended Training Exchange Program during 2012. The goal of the program is to strengthen the safety of consumer products in the United States through capacity building within product safety agencies in source countries and by obtaining unique know-how from partner regulators in developed markets. CPSC hosted fellows at the CPSC from Health Canada and from the Australian Competition and Consumer Commission. They made substantial contributions to the CPSC in the areas of hazard analysis and public communication management. This collaboration also strengthens our existing ties with these important partners.

**Rigorous Hazard Identification**

CPSC analyzes information on injuries, deaths, and other consumer product safety incidents to determine which product hazards represent the greatest risks to consumer safety. Sources include consumers and consumer groups, hospitals and clinics, industry, and the press, as well as economic and hazard exposure information on products under its jurisdiction. CPSC works to improve the quality of crucial product hazard data, and staff investigates specific injury cases to gain additional knowledge about injuries or hazards and any consumer products involved.

- CPSC collects information on injuries, deaths, and other consumer product safety incidents from consumers and consumer groups, hospitals and clinics, and industry. Staff has collected information about product-related injuries treated in hospital emergency rooms through the National Electronic Injury Surveillance System (NEISS), and incident data from medical examiners and coroners' reports, news clips, and CPSC's consumer Hotline. In FY 2012, CPSC collected more than 400,000 NEISS reports and more than 10,000 death certificates, medical examiner reports, and coroner reports.
- CPSC launched the publicly available Consumer Product Safety Information Database, available at www.SaferProducts.gov, in March 2011. Consumers have the ability to report consumer products that cause harm or pose a risk of harm through the database, and to search reports submitted by others to make informed decisions about the products they own or consider purchasing. Since the site launched, 4,217 businesses registered through the business portal, and CPSC posted more than 13,500 reports of harm on: www.SaferProducts.gov.
- CPSC has developed a robust import enforcement program, leveraging our partnership with U.S. Customs and Border Protection (CBP), and we have expanded the placement of CPSC experts collocated at some of the largest ports in the country. In 2012, CPSC screened more than 17,000 models of imported consumer products at U.S. ports.
- CPSC staff worked with CBP to develop the pilot Risk Assessment Methodology (RAM), which aligns with the President's National Strategy for Global Supply Chain Security and uses improved information technology to target the highest risk imports that are most likely to violate consumer product safety statutes and regulations.
- In 2009, CPSC created a dedicated Internet Surveillance Unit to assist in marketplace surveillance of the largest and most popular retail and wholesale Internet auction sites to identify sellers offering banned, recalled, or dangerous products. Between 2009-2012, CPSC investigators contacted more than 16,000 firms and individuals who were attempting to sell banned or previously recalled consumer products via internet websites, causing the sales to be halted and keeping these dangerous products from entering the consumer retail or resale market.
- In fiscal year 2012, CPSC targeting resulted in the seizure of at least 20 shipments with Intellectual Property Rights violations, with an estimated Manufacturer's Suggested Retail Price (MSRP) of more than $1 million.

- Working with CBP, CPSC staff screened thousands of consumer products that were in violation of U.S. standards or otherwise unsafe and stopped them from reaching store shelves. From 2010 through 2012, the hard work of CPSC and CBP staff resulted in more than 16.4 million units being stopped at our nation's ports from more than 34,000 screened products, due to safety concerns or the failure to meet federal safety standards.

**Decisive Response**

CPSC takes a proactive approach to intercept goods at ports before they are distributed in commerce and hold violators accountable. If hazardous products are identified domestically, the CPSC takes action to protect consumers. Field staff conducts investigations of incidents and injuries and inspections of manufacturers, retailers, and importers. Multidisciplinary teams of CPSC staff review investigative reports and product samples to determine when possible violations and defects warrant corrective action. When a recall is necessary, CPSC staff negotiates with the firm to seek a voluntary recall that provides the consumer with a free remedy.

- CPSC obtained more than 1,800 recalls between 2009 and 2012. In 2012, CPSC conducted 439 recalls involving more than 91 million units from around the world.
- CPSC staff conducted about 3,000 recall check investigations of establishments from 2009 to 2012, at all levels of the distribution chain as follow-up to ongoing serious injury or death incident investigations to determine compliance with voluntary and regulated product standards and to determine whether the products involved posed a substantial product hazard.
- CPSC secured more than $17 million in civil penalties from FY 2010 through February 2013 for violations of mandatory regulations, including the lead paint ban, lead content, and federal fireworks regulations; and failing to report in a timely manner defects or potential defects in a wide range of consumer products, including children's upper outerwear, exercise equipment, appliances, lawn equipment, furniture, toys, lithium-ion battery packs, and baby flotation boats. In 2012, CPSC negotiated $7.654 million in civil penalties through out-of-court settlements.
- Lawsuits Filed Seeking Mandatory Recall Remedies under Section 15 of the CPSA:
    - CPSC has filed three separate lawsuits under Section 15 of the CPSA against three companies that manufacture and distribute rare earth magnets; the actions seek determinations that these products constitute a substantial product hazard and seek mandatory recall remedies for consumers.
    - CPSC has filed an administrative complaint against an inclined sleep product manufacturer, seeking a determination that the inclined sleep product constitutes a substantial product hazard and seeking mandatory recall remedies for consumers.

- CPSC's investigation of imported drywall was the most comprehensive in the agency's history and spanned multiple continents. The investigation took place from 2009 to 2011. Field investigators conducted hundreds of onsite investigations involving consumer complaints of contaminated homes; more than 60 inspections were conducted on domestic drywall manufacturers and distributors. Furthermore, technical visits were conducted at mines and

processing plants in the United States as well as in the People's Republic of China. Additional studies were undertaken, as needed, and were reported promptly upon their completion. Staff prepared and released 10 reports on the results of technical studies related to problem drywall.

- In December 2009, CPSC and the Window Covering Safety Council issued a voluntary recall to repair all Roman shades and roll-up blinds. At that time, approximately 8 million Roman shades and roll-up blinds were being sold per year. CPSC had received reports of five deaths and 16 near-strangulations from Roman shades between 2006 and 2009, and three deaths from roll-up blinds between 2001 and 2009. About 130,000 free repair kits for Roman and roll-up shades were distributed between the recall and through 2012. Another 150,000 kits containing tassels and cord stops were distributed during the same time period.
- Actions filed in Federal district that permanently restrain manufacturers, and distributors of products that do not comply with CPSC statutes, rules and bans. The permanent injunctions obtained include the following:
    - In March 2011, CPSC obtained consent decrees of permanent injunctions against sellers of banned lawn darts.
    - In November 2011, CPSC obtained a permanent injunction against a manufacturer of mattresses that violated federal flammability standards.
    - In March 2011, CPSC obtained a consent decree of permanent injunction and a $2.05 million civil penalty against an importer of toys and other children's products for repeated violations of the CPSA and FHSA for small parts regulation, the lead in paint ban, the phthalates ban, and lead content in excess of the statutory limits.
    - In March and April 2011, CPSC obtained a consent decree of permanent injunction, civil penalty, and criminal fine against an importer and seller of toys and other products that violated the CPSA and FHSA, including the small parts regulations, lead in paint ban, lead content limit, limits on phthalates, and requirements for rattles.
- In 2011, CPSC implemented a limited proof of concept Risk Assessment Methodology (RAM) pilot that allows CPSC to analyze data available in CBP's International Trade Data System (ITDS) to target potentially violative products coming into the United States. The RAM enables CPSC to: (1) automate the process of targeting shipments using a rule-based engine; (2) increase the statistical rate with which offending importers and goods are targeted and found; and (3) facilitate the flow of legitimate trade. In February 2013, the Assistant Attorney General of the Criminal Division of the U.S. Department of Justice announced that five individuals and five corporations had been indicted in federal court in Brooklyn, NYand among the charges was importing and trafficking hazardous toys in violation of the Consumer Product Safety Act (CPSA).
- In 2010, CPSC wrote the information and enforcement rules: Rule on Publicly Available Consumer Product Safety Information Database, and Rule on Civil Penalty Factors.
- CPSC staff inspected about 4,300 firms for compliance with CPSC's laws and regulations from 2009 to 2012. In FY 2012, CPSC completed 1,184 establishment inspections of firms.
- Between 2009 and 2012, CPSC staff sent 7,000 letters of advice and negotiated more than 1,600 corrective action plans to address safety in consumer products. In 2012, CPSC sent

2,320 letters of advice and negotiated 411 corrective action plans to address safety in consumer products.

- In 2011, CPSC relocated the existing laboratory facility to the new National Product Testing and Evaluation Center (NPTEC), where CPSC scientists and engineers test potentially hazardous products for defects and develop testing methods to determine compliance with safety standards. NPTEC has enhanced the CPSC's ability to protect families and consumers from harm by expanding testing capabilities, and increasing the efficiency of agency staff and equipment.
    - NPTEC is a facility of 63,000 square feet, with 32,000 square feet of laboratory space. This is an increase of 44,000 square feet from the previous CPSC laboratory. Approximately 105 engineers, scientists, and support staff are located there. This new facility houses a toy test lab; a children's products lab; a pool and spa products lab; a flammability and fire test lab, and an impact lab, where products such as bicycle helmets are tested. It also houses individual testing areas for general products; outdoor power sports products, electrical products, and combustion products.
    - Since NPTEC opened in May 2011, CPSC has conducted more than 100 facility tours for more than 1,500 people representing consumers, manufacturers, industry associations, school groups, professional societies, local, state and federal agencies, and foreign governments.
- CPSC has enforced the Virginia Graeme Baker Pool and Spa Safety Act by inspecting pools and spas for compliant anti-entrapment drain covers, complemented by an extensive public education campaign. Between 2009 and 2012, CPSC inspected 6,494 pools, spas, wading pools and water activities.
- CPSC investigated and then in 2011 issued a national early warning on stadium light poles. The Commission notified all owners who purchased and installed the defective poles, before anyone suffered injuries or died.

**Raising Awareness**

Raising awareness of longstanding, hidden, and emerging product safety hazards is crucial to empowering consumers and reducing the risk of death and injury. CPSC has had success in educating the public and industry through increased use of social media, traditional media, and targeted safety campaigns that aim to reach vulnerable populations affected by, but not necessarily aware of certain product hazards.

- CPSC issued more than 2,000 press releases and recall alerts, and disseminated tens of thousands of electronic safety messages through CPSC's website.
- CPSC reached consumers through more than 8 billion impressions of CPSC safety messages disseminated in various media including print, broadcast (including satellite media tours, television, and radio), Internet news sources, and social media (including a blog, Twitter,

YouTube, and Flickr). In 2012, 2.55 billion impressions of CPSC safety messages were received by consumers. By the end of 2012, there were 17,550 estimated followers of CPSC safety messages on Twitter. The growth of CPSC's consumer outreach has been significant, as there were 1.28 billion impressions in 2009, and the agency was just starting to establish a presence on Twitter.

- CPSC staff has conducted targeted national campaigns to raise public awareness, support industry compliance, and improve safety in specific consumer product areas. This has included the *Pool Safely* campaign (www.PoolSafely.gov), a national public education effort to reduce child drowning and drain entrapments in swimming pools and spas. In addition, CPSC has partnered with safety advocacy and community groups, and state and local government agencies to implement the *Safe Sleep* outreach and education effort, which promotes safe sleeping environments for babies and toddlers. It also highlights the new crib safety standards that prohibit the sale of drop-side cribs in the United States and warns of hazards associated with soft bedding, infant slings, sleep positioners, and baby monitor cords.
- CPSC increased the number of members of the Neighborhood Safety Network (NSN) from about 3,000 in 2009 to 7,500 in January 2013. The NSN is a grassroots outreach program that provides timely information to member organizations and individuals, who in turn, share CPSC safety messages with underserved consumers who might otherwise never hear of or receive information from the CPSC.
- CPSC established the agency's presence on social media in September 2009 with the launch of the "CPSC 2.0 initiative." In 2012, the agency's OnSafety blog received about 200,000 page views a month; and the number of Twitter followers of @OnSafety approached 20,000.There have been nearly 600,000 views of our YouTube videos in English and Spanish; and thousands of views of our Flickr photo galleries, visitors to our Storify site, and users of our Recalls app and Recalls widget.
- CPSC has disseminated free of charge to the public more than 3 million publications and brochures, from *Pool Safely* materials to baby safety checklists, to a popular handbook for public playground safety.
- Chairman Tenenbaum has participated in numerous press events including:
    - Drowning prevention (in Houston, San Diego, Ft. Lauderdale, Minneapolis/St. Paul, and Washington, D.C.);
    - Back to school safety (in Columbia, S.C. and Washington, D.C.);
    - Product registration cards and juvenile product safety (in Chicago);
    - Fireworks safety (four straight years on the National Mall in Washington, D.C.);
    - Import surveillance (in Elizabeth, N.J.);
    - Brain safety in youth sports (in Akron, OH); and
    - International product safety matters (in Beijing, Brussels, Singapore, Hong Kong, Rio de Janeiro, and Majorca).
- CPSC launched the *Pool Safely* campaign, a first-of-its-kind, multiyear media and education campaign aimed at preventing child drownings and drain entrapments in pools and spas. The *Pool Safely* campaign has more than 500 partners across the country; has funded efforts by

Safe Kids Worldwide to work with Head Start programs and the National Drowning Prevention Alliance with first responders on drowning prevention; and has funded dozens of training seminars for state and local health officials, pool and spa operators, and industry professionals on how to comply with Section 1404 of the Virginia Graeme Baker Pool and Spa Safety Act.

- CPSC's Chairman and senior spokespersons have conducted media interviews with *The New York Times*, *The Washington Post*, *The Wall Street Journal*, *USA Today*, *Chicago Tribune*, *Los Angeles Times*, Associated Press, Bloomberg, Reuters, AP Radio, CBS Radio, CNN Radio, ABC Radio, National Public Radio, *The Consumerist*, The Today Show, Good Morning America, CBS Early Show, CNN, Fox News Sunday, dozens of local TV affiliates, *Product Safety Letter*, Bloomberg BNA, and more. The interviews covered topics such as high profile recalls, the hazards posed by gel fuels, rulemaking on table saws, the www.SaferProducts.gov database, water walking balls, safe sleep for babies, implementation of the crib rule, efforts to strengthen the product safety net for children, reorganization of the agency, import safety and surveillance, pool safety, civil penalties, and more.
- CPSC has supported the business community through development of webinars, social media, such as SlideShare and Twitter, and through direct engagement at industry-sponsored events. New Web pages and easily understood regulatory summaries have been developed and communicated to businesses. Plain language guidance is updated regularly to help small businesses to comply with new legislation and CPSC's enforcement policies.
- CPSC staff has implemented a successful grassroots outreach campaign aimed at increasing awareness among minority and underserved consumers of critical safety hazards in the home. The program has involved working with organizations and events that serve minority audiences.
- CPSC received more than 526,000 calls to the CPSC Hotline between 2009 and 2012. The majority of calls were related to addressing issues with recalls, fulfilling publication requests, and answering general information questions.

**Other CPSC Accomplishments**

- Since 2009, the Commission has held more than 400 votes. Eighty-seven percent of those votes have been unanimous.
- CPSC had eight petitions docketed between 2009 and 2012.
- From 2009 to 2012, CPSC held 61 public commission meetings.
- In August 2011, the Commission announced a reorganization of its management structure to meet its mission challenges better in an ever-changing global marketplace. In response to a rapidly expanding marketplace of consumer goods, making the challenge of overseeing and regulating the thousands of product types within the agency's jurisdiction all the more complex, the Commission realigned the organization with agency priorities established in its strategic plan.
- Since August 2009, CPSC has testified at 14 congressional hearings and provided 21 sets of written testimony to committees. Of those 14 hearings, the Chairman testified at nine.

- Since August 2009, CPSC's Office of Legislative Affairs has sent more than 1,200 written responses to congressional inquiries and statutorily required congressional reports. The Office of Legislative Affairs has also handled thousands of other informal congressional staff inquiries.
- CPSC acted on 18 cases of trade complaints between 2009 and 2012.
- In March 2011, CPSC launched a searchable public website: www.SaferProducts.gov, to meet the requirements of CPSIA Section 212 (codified as Section 6A of the Consumer Product Safety Act, as amended). Through this website, the public can submit reports of harm relating to products, search for reports, and find consumer product recall information. Businesses can submit comments on filed reports, file other claims, and forward additional information to the CPSC electronically. This database gives consumers access to product safety information that previously could be obtained only through Freedom of Information Act (FOIA) requests. The database also increases the Commission's focus on preventative efforts and empowers consumers to make independent decisions about their safety and their families' safety.
- In 2009, CPSC began an ongoing effort to modernize its server environment by replacing physical hardware with virtual machines to enhance system reliability and increase efficiency. Currently, CPSC supports more than 150 virtualized servers.
- CPSC has undertaken a multiyear IT modernization effort to standardize how data are captured and integrate once-disparate systems to enable analysis and manage caseloads across the agency. As part of this effort, CPSC is developing the Consumer Product Safety Risk Management System (CPSRMS), Dynamic Case Management (DCM) system, and the agency has launched a redesigned website.
- CPSC updated its business processes to improve its ability to detect emerging hazards and manage incoming incident data. The creation of Integrated Product Teams (IPTs), made up of staff from multiple offices and disciplines throughout the agency, is a collaborative approach to hazard identification. The IPTs are a critical element in facilitating the prioritization and identification of emerging hazards.
- To improve business processes, CPSC developed new IT systems and enhanced existing systems, such as:
    - Modernizing the Early Warning System and expanded the system to include all products, not just children's products;
    - Developing a new and enhanced Budget Application to replace the legacy system;
    - Developing an IT system that streamlined the intake and triage of product safety data;
    - Developing a Recalls Web Interface that allows sharing of recall information with the international community;
    - Developing an IT system to provide automated exchange of data with foreign government;
    - Developing an IT system for Laboratory Accreditation; and
    - Implementing an IT solution that automated the Freedom of Information Act business process.

- CPSC enhanced information security to protect against cyber threats by implementing major security requirements mandated by the Office of Management and Budget, such as two-factor authentication, system contingency plans, and enhanced security settings across the information technology infrastructure. CPSC also participated in the government-wide Trusted Internet Connection (TIC) initiative that allows the Commission to connect to the public Internet, while ensuring consistent, up-to-date security, without the Commission having to maintain Internet security hardware and software on its premises. Additionally, CPSC implemented continuous monitoring that scans CPSC network to identify security issues.
- As part of CPSC's continuity of operations strategy, CPSC built a data center at the National Product Testing and Evaluation Center that provides backup for Headquarter agency data.
- CPSC developed an IT investment Management Program by establishing a Capital Planning and Investment Control Program, a Program Management Office, and an IT Investment Review Board.
- CPSC hired 292 permanent federal employees between 2009 and 2012.
- American Federation of Government Employees (AFGE) Local 3579 and CPSC management formed the CPSC Labor Management Council, developed a Charter, and collaborated successfully on many employment and policy issues, including an updated telework policy.
- According to the Employee Viewpoint Survey, CPSC's overall index score measuring employee satisfaction and commitment increased 10 points from 2009 to 2012. CPSC held focus groups, increased employee participation, and developed and implemented an action plan to address the 10 lowest scoring items on the survey. Nine of the 10 items addressed showed an increase in score between 2010 and 2012.
- Historically, CPSC has maintained a robust telework program with our Product Safety Investigators around the country teleworking full-time from home since 2001. In addition, since 2009, CPSC has steadily expanded the telework program to include: telework for weather emergencies, eligibility for regular and recurring telework to most of the workforce, and the eligibility of management officials and most administrative positions for ad hoc telework. At present, 84 percent of the CPSC workforce is eligible for some type of telework.

## CPSC 2011 - 2016 Strategic Plan



CPSC's strategic plan lays out an approach to achieve the agency's consumer product safety mission.

Download the Strategic Plan

# Attachment 2

**Inez M. Tenenbaum**
**Attorney at Law**
**Wyche, P.A.**
**Columbia, South Carolina**

**Biography**

Inez Tenenbaum practices law at Wyche, P.A. in both the Columbia and Greenville, South Carolina offices. She practices in the area of consumer product safety and advises clients on matters involving the U.S. Consumer Product Safety Commission (CPSC) and other regulatory bodies, including product testing and certification, compliance programs, risk assessment and management, regulatory oversight, product reporting and recalls, and litigation. Ms. Tenenbaum also provides consulting services on education policy for state and regional organizations whose mission is to provide a quality education for all children.

**Chairman, U.S. Consumer Product Safety Commission**

Ms. Tenenbaum was appointed by President Barack Obama on June 22, 2009, as Chairman of the U.S. Consumer Product Safety Commission and served until November 30, 2013. Tenenbaum established a leadership philosophy aimed at making the agency more accessible and transparent; making education and advocacy a priority; and being firm, but fair in enforcing product safety laws.

During her tenure, she fulfilled a key promise to the Congress and consumers by working closely with agency staff, industry, and consumer stakeholders to complete all the major safety rules required by the Consumer Product Safety Improvement Act of 2008 (CPSIA), a law that reformed and empowered the CPSC. In implementing the Act, Ms. Tenenbaum advocated and the Commission supported:

- the establishment of the strongest baby crib safety standards in the world;
- the lowest lead limit for children's products in the world;
- mandatory standards for toys, toxic metals, and juvenile products; and
- premarket testing of children's products by independent, third-party laboratories.

Ms. Tenenbaum's term has been referred to as the most transformative in the history of the CPSC. Her leadership resulted in the creation of the first CPSC public database, wwwsaferproducts.gov, that provides consumers and manufacturers with unprecedented access to information about the safety of consumer product hazards. Ms. Tenenbaum also created the Office of Education, Global Outreach, and Small Business Ombudsman to coordinate and provide outreach to various domestic and international stakeholders, including manufacturers, retailers, resellers, small businesses, and foreign governments. During her tenure, the CPSC opened its first overseas office, located at the U.S. Embassy in Beijing. As Chairman of the CPSC, Ms. Tenenbaum led the agency to develop a five-year strategic plan that positioned the agency as being the recognized global leader in consumer product safety.

**South Carolina State Superintendent of Education**

Prior to becoming Chairman of the U.S. Consumer Product Safety Commission, Ms. Tenenbaum served as South Carolina's State Superintendent of Education from 1999-2007. During her tenure as State Superintendent, student achievement in South Carolina improved at the fastest rate in the nation, with scores increasing on every state, national, and international tests administered. At the end of Ms. Tenenbaum's tenure, the prestigious journal Education Week ranked South Carolina number one in the country for the quality of its academic standards, assessment, and accountability systems.

**Education:**

University of South Carolina School of Law, J.D., 1986
Associate Editor-in-Chief, *South Carolina Law Review*

The University of Georgia, Athens, GA, M.Ed., 1974

The University of Georgia, Athens, GA, B.S., 1972